May Term,
1858.

SWAIN
v.
BUSSELL.

SWAIN *v.* BUSSELL and Others.

Schemes for the division of property to be determined by chance, are prohibited by law.

Suit to annul and set aside a deed. The consideration of the deed was 1,533 shares in a lottery, or division of property to be determined by chance. The complaint states that the deed was made to the owner and manager of the scheme; but it also shows that the plaintiff was himself a shareholder and participant in the scheme, with notice of ·its terms and illegal character. *Held*, that he is not in a position to ask the aid of the Courts in this form of action; that he cannot avoid his own act because of fraud and illegality connected with it, in which he shows himself to have been a participant.

*Saturday,*
*June 19.*

APPEAL from the *Rush* Circuit Court.

HANNA, J.—*Swain*, on the 4th of *February*, 1856, filed his complaint alleging that on the 2d day of *February*, 1855, he sold and conveyed to *Bussell* certain real estate, in consideration of the transfer to him by said *Bussell* of 1,533 shares in what was known as the " *Shelbyville Real Estate Company;*" that said deed was so made upon the representations and conditions contained in a circular in said complaint set forth, and upon the express condition that said *Bussell* should truly perform said conditions; that *Bussell* represented that said company was not a scheme for the division of property by chance—was not a lottery—but an honest transaction; that the lands described in the circular were choice, and the titles good; and that on the 15th of *May*, 1855, they should be distributed among the owners of the shares fairly, and that afterwards he would make to each one a good deed for the lands awarded him.

But he avers that the said *Bussell* was the sole owner of said scheme; that it was for the division of the lands mentioned, by chance, and the said shares sold him were shares therein; that *Bussell's* representations were false and intended to defraud, &c.; that *Bussell* did not own, nor could he make title to the same; that the whole scheme and plan set forth in the circular was abandoned, &c., and, therefore, the conditions of said sale were never performed; that the consideration was illegal, and said deed obtained by fraud; that afterwards each of the other defendants purchased of

*Bussell* with full notice, and have not yet paid the pur-
chase-money to him.

The circular referred to states that there would be, on the
15th of *May*, 1855, at *Shelbyville, Indiana*, a sale by the
said company of choice lands, to the amount of 150,000
dollars; that upon this amount of stock they have issued
50,000 shares, which they would sell at three dollars each,
and would distribute, at the time and place stated, all of
said property amongst the shareholders, severally, as may
be determined by the numbers on their certificates, under
the management of a board of responsible gentlemen.
Then follows a list of the property, described in the circu-
lar as a list of prizes, in which is described this land in dis-
pute, as the " *Swain Mills* on *Flat-Rock, Rush* county, *In-
diana*, together with 40 acres of land, and a first class saw-
mill attached," and the value set out at 7,200 dollars.    It
is alleged that the title to all of said lands is good, &c.,
and that proper conveyances will be made to the lucky
owners, immediately after the drawing; that the number
of prizes is 3,329, which gives one chance in 15 to draw—
perhaps—a fortune.    Then follows a puff of Dr. *Bussell*,
a statement that he is fully empowered by his colleagues
to manage the scheme as may best suit their interest, &c.,
and an offer of a large per cent. to agents to engage in the
sale of shares.

The plaintiff asks that the deed to *Bussell* be annulled
and set aside, and, also, from him to the other defendants.

To this complaint the defendants, other than said *Bus-
sell*, filed a demurrer, which was by the Court sustained.
Upon this, the question is presented for our consideration.

The first point presented is, whether this transaction was
illegal, and one that was prohibited by law.

Without doubt, the whole scheme was an illegal, pro-
hibited, proceeding; and the allegations in the complaint
that the defendant verbally represented to the plaintiff that
such was not its character, are of no avail against the state-
ments and contents of the printed circular, which is made
a part of the complaint, and upon the representations and
promises whereof plaintiff avers he made the deed.    The

scheme was one of the forms of a lottery, whereby several persons might place their property in a common fund, representing such sums as the parties should agree upon, and thereupon issuing and selling to the unwary and the credulous, tickets representing shares in said scheme. These tickets might thus issue to the real value, or twice, or thrice, or any number of times, the real value, of the property—depending upon the partial honesty, or the total dishonesty of the managers of such scheme. In a word, such schemes for the division of property to be determined by chance, are prohibited by law. 2 R. S. p. 437.—State Constitution, 1 *id.* 69.

The statute is that, " If any person shall sell any lottery tickets, or share in any lottery, or scheme for the division of property to be determined by chance, or shall make or draw any lottery, or scheme for a division of property, not authorized by law, such person on conviction shall be fined not exceeding five hundred dollars."

The constitutional provision is, that " No lottery shall be authorized; nor shall the sale of lottery tickets be allowed."

That the managers of the concern believed it to be a violation of the constitution and the law, is manifest from a clause in their circular, as follows:  " Those who desire to operate in this enterprise without incurring any risk from law, or violating any oath of office, can do so by forming clubs and ordering the shares through the mail; we have already sold 13,000 shares in this way."

The following cases are cited from decisions of our sister states, and it is believed correspond with our view of this case as expressed above:

The case of *The State* v. *Clark*, 2 Fogg, 33 New Hamp. R. 334, was an indictment for unlawfully disposing of one ring by lottery, and was founded upon the following statute:  " If any person shall make or put up any lottery, or shall dispose of any estate, real or personal, by lottery, he shall be fined," &c.   The facts were, that one *Flanders* bought of defendants a book for 1 dollar, which was worth less than that sum, on the back of which was a written

number, which number was then compared with certain numbers and entries in a book of defendants; and he was informed that he was entitled to a gold ring worth three dollars, which was delivered to him. He was induced to make the purchase from seeing a handbill headed "gift-book sale."

The defendants were convicted, and the Supreme Court held the finding right; and they say "that where a pecuniary consideration is paid, and it is determined by lot or chance, according to some scheme held out to the public, what the party who pays the money is to have for it, or whether he is to have anything, it is a lottery," &c.

. In *Den ex dem. Wooden* v. *Shotwell,* said *Wooden* had divided a parcel of land into fifty-eight lots of unequal value, from 50 dollars to 600 dollars per lot, and disposed of them at 75 dollars each; and the particular lot of land to which each person was to receive a title was determined by *lot.* The Supreme Court of *New Jersey* say this was, both in substance and in form, a lottery. 3 Zabriskie, 470. See, also, *Thorn* and *Cory* v. *Wooden,* 2 *id.* ——; 4 Wash. C. C. 129; 4 Serg. & R. 151.

*The People* v. *The American Art Union,* 13 Barbour, S. C. 577, was a proceeding against the. *Art Union* upon substantially the following state of facts: Persons became subscribers at a fixed price. The society purchased works of art, and once each year each work was numbered and the number placed in a box. The name of every member of the association was also placed in a similar box. A number was then drawn from the box, and a name drawn from the other box, and the person whose name was drawn was to be the owner of the work represented by the number just drawn. This was declared to be a lottery—a mode of distribution illegal and unconstitutional. The constitutional provision is very similar to ours; it is as follows: " No lottery shall hereafter be authorized, or any sale of lottery tickets allowed within this state." This case was afterwards taken to the Court of Appeals, and in *October,* 1852, that Court decided that it was a scheme having all the attributes and elements of a lottery; that it

was a kind of game of hazzard, wherein several lots of merchandise are deposited in prizes for the advantage of the fortunate (Rees's Cyclopedia); that it is a game of hazzard, &c. (12 Brewster's Ed. Encyclopedia, 258); that it was prohibited by the constitution. The judgment of the Supreme Court was affirmed. 3 Selden, 235.

In *Thatcher* v. *Morris*, the Court of Appeals of *New York* held, that in a suit upon lottery tickets to recover the prize drawn by such tickets in a *Maryland* lottery, the plaintiff must show on the face of his complaint that his title was acquired—his contract made—in a jurisdiction where gambling was authorized by law; because such tickets were a part of the machinery for carrying on a business prohibited by law. 1 Kernan, 438. In the same case, it is stated to be conceded that such a contract is immoral, and that no right of action can accrue to a party by reason of such contracts and dealings. *Id.* 438, 439.

But it is argued that the purchase of lottery tickets is not an illegal or immoral transaction, and *Swain* was not acting in violation of law although *Bussell* might have been; and therefore, Courts of law will aid *Swain* to amend the executed contract, when such aid would not be extended to *Bussell* to compel the performance of the contract if it had not been executed. This reasoning is unsound. It was evidently the intention of the framers of our fundamental law, and our statute, to discountenance and, as far as possible, suppress gambling in all its forms, one of the most seductive phases of which is presented in the guise of lottery schemes and chance distributions of property. If the plaintiff, with the facts before him, saw proper to become a participant in such an illegal and prohibited transaction—a transaction not only in violation of the statute and the constitutional prohibition, but evidently, from the view taken of it by our law-makers, in contravention of public policy as understood by them, he is not in a condition to ask, in this form, the aid of a Court of justice to relieve him from the superior skill of his associate. Such combinations were viewed by our legislators as formed to deceive and defraud the public. And if one of the associ-

May Term,
1858.

SWAIN
v.
BUSSELL.

ates should, by his greater disregard of right, succeed in defrauding his fellows, Courts are not open to administer relief to them in the manner here sought, because of their participation in those acts so much at war with public policy. The plaintiff, in the case at bar, does not stand in Court as a mere purchaser of tickets in this scheme. By his own showing he received 1,533 shares, of the conventional value of 4,000 dollars, as the consideration for his land; and at the same time he had before him a circular in which the land was held up to the public as of the value of 7,200 dollars, or 3,200 dollars more than he received therefor. The real value of the property he nowhere alleges. Nor is it clearly shown whether it was the intention of the associates in this scheme to really dispose of their property at exhorbitant prices, or whether they retained in their own hands a majority of the chances, and thus intended to absorb the property, and fleece the public out of the amount for which tickets were in fact sold. Be that as it may, there was, it is clear, an arrangement to violate the law and contravene sound public policy. This is shown by a fair legal interpretation of the circular made a part of the complaint.

The decisions are not uniform upon the subject of lotteries, either upon the morality or immorality thereof, or of the legal rights of parties directly or indirectly engaged therein.

Several cases are cited by counsel, some of which will be noticed.

In the case in 3 Zabriskie, heretofore cited, it is held as undisputed law, that "when money or other personal property is paid by one of two parties to an illegal contract to the other, where both may be considered as *particeps criminis*, an action cannot be maintained, after the contract is executed, to recover the money. So money lost by illegal gaming cannot be recovered, except when specially authorized by statute." See Broom's Legal Maxims, 325. In the case cited, the opinion does not intimate that a different rule prevails in reference to the recovery of real estate, in such instances, except in this, that the plaintiff had the

right in that case to recover because of his previous un-tainted title to the land in dispute, and to which alone he appealed on the trial, and against which title the defend-ant could not set up, nor the Court give legal effect and validity to, a deed which the statute of that state declared invalid and void. That statute was as follows: "That every grant, bargain, sale, conveyance, or transfer of any goods, chattels, lands, tenements, hereditaments, or real es-tate, which shall be made in pursuance of any such lotte-ry, is hereby declared to be invalid and void." We have no such statute in this state.

The *Lessee of Bond* v. *Swearingen*, 1 Ohio R. 403, cited by the appellant, appears, also, to have been governed by the territorial statute in force at the time the deed, founded on a gambling consideration forbidden by that statute, was made. The effect of that decision is, that the deed was void as against creditors; and indeed, if there had been no creditors, that the title to the land would, in pursuance of that statute, have been vested in the heirs of the grantor, instead of passing by the deed to the grantee therein named.

*Lee* and *Mullikin* executed their bond to *Bruce*, binding themselves, &c., founded upon the consideration that the latter would withdraw his opposition to one *Elliott's* obtain-ing a discharge under the insolvent act. It was held that the consideration of the bond was illegal, and that the suit could not be maintained. 4 Johns. 412.—2 *id.* 386.

In an action by the managers of a lottery against a de-faulting agent for the sale of tickets, to recover the price of the tickets delivered to him, it was held, among other things that, "whenever from the plaintiff's own showing, or other-wise, the cause of action appears to arise from the trans-gression of a positive law of the country, he has no right to be assisted,"—and that the action could not be sus-tained. 5 Johns. 327.

In the case of *The Inhabitants, &c.* v. *Eaton*, 11 Mass. R. 368, which was a suit brought to recover certain real pro-perty transferred by deed as a composition of a felony, it was held that where two parties agree in violating the laws of the land, the Court will not entertain the claim of either

party against the other, for the fruits of such unlawful bargain. If a party has foolishly paid his money, repents his folly and brings his action to recover it back, the law will say to him: You have paid the price of your wickedness, and you must not have the aid of the law, to rid you of an inconvenience, which is a suitable punishment for your offense; and that no distinction exists between the payment of money, and a conveyance of land upon such a consideration.

*Burger* sued *Rice* on a contract by which *Rice* agreed to let *Burger* have the keeping of one-half of the paupers of *Floyd* county, the keeping of whom had been awarded to *Rice*. *Burger* had partly performed and offered to complete the performance of his part of the contract. The Court instructed the jury that such contract was illegal as against public policy; and that "the law will neither enforce such a contract, nor relieve a party from loss by having in part performed it." The finding was for the defendant, and was affirmed in this Court. 3 Ind. R. 127.

In a suit upon a promissory note, the consideration of which was the loan of individual small bills, the issue of which for circulation was prohibited by statute, the defendant had judgment because of the illegality of the consideration. *Madison, &c., Co.* v. *Forsythe*, 2 Ind. R. 484.

*Catts* v. *Phalen et al.*, was a suit by the appellees to recover 12,500 dollars, money had and received to their use. *Catts* had been employed by the plaintiffs to do the manual acts necessary, &c., in drawing the numbers of a lottery of which they were managers. He fraudulently pretended that a certain ticket had drawn 15,000 dollars, which ticket he secretly owned. The plaintiffs paid the money to the person who acted for *Catts*, &c. The suit was to recover it. It was held that the illegality of the lottery was not a defense to the action. 2 Howard (U. S.), 376, 15 Curtis, 142.

In *Watts* v. *Brookes*, it was said by the chancellor that he could "not allow it to be argued that you can break a law covertly. What you cannot do openly you cannot do

secretly.   A man cannot set up an illegal act of his own in order to avoid his own deed." 3 Vesey's Ch. 612.

It is thought that the case in 3 Zabriskie, and that in 2 Howard, should weigh much in favor of the position of the appellant.   It is not necessary now to determine whether the decision in *New Jersey* might not have been influenced by the statute of that state, nor to critically examine the reasoning resorted to, and the conclusion arrived at; nor need we decide whether, in our opinion, it is supported by, or is adverse to, the weight of authorities; for it is by that Court placed upon the ground that the plaintiff did not base his claim upon the illegal transaction, and the defendant did attempt to sustain his defense by virtue of it.

Without stopping to carefully consider the reasoning of the case in 2 Howard, we might say that the facts upon which that opinion was pronounced differed widely from those in this case.   In that, the plaintiffs had acted merely as managers of a lottery, supposed to be authorized by law, for the benefit of a public work; and if any recovery which might be had by them would be for the benefit of that work, and would not redound to their individual interest, then their position was very different from that of the plaintiff in this case; for he seeks to annul his own act, because of the fraud and illegality that was connected with it, and in which he shows he participated, and that he may individually be benefited thereby.   This we do not think he is in a position to ask the Court, in this form of action, to do for him, and the demurrer was, therefore, properly sustained.

*Per Curiam.*—The judgment is affirmed with costs.

*A. W. Hubbard, L. Sexton* and *P. A. Hackleman,* for the appellant (1).

*J. S. Scobey* and *W. Cumback,* for the appellees (2).

(1) Counsel for the appellant argued as follows:

The judgment of the Court was that the complaint did not state sufficient facts to constitute a cause of action; but the real ground upon which the Court sustained the demurrer was, that the contract was so tainted with immorality that the Court could not afford relief.   We think the decision of the Circuit Court is erroneous under any view of the case.   Lotteries are not *mala in se.*

It is not contrary to the law to buy lottery tickets. In some of the states lotteries are sanctioned and upheld by statutory provisions. There is not an equal degree of criminality, therefore; and the reason why Courts have in some instances refused to interfere to relieve against immoral contracts, does not apply. Besides, the complaint expressly alleges that *Bussell* represented to the plaintiff that the *Real Estate Company* was not a scheme for the division of property by chance; that it was not a lottery, but an honest and legal transaction. These statements of *Bussell* are important. He was the manager of the concern, and the plaintiff had a right to presume that he had a better knowledge of the facts than any other person. Whether it was a lottery, or a scheme for the division of property by chance, was a question of fact peculiarly within his knowledge; and if his statements were untrue, they were a fraud upon the plaintiff. The maxim, *In pari delicto potior est conditio defendentis,* does not apply; for on the part of the plaintiff there was no criminality—the act so far as he was concerned being neither illegal nor immoral. If *Bussell's* statements were false, he obtained the deed by fraud, and the contract can be avoided by the plaintiff; and he is entitled to the aid of the proper Court in obtaining relief. To deny this, would be to punish the innocent and reward the guilty. Where both parties are truly in *pari delicto,* relief will not be granted, unless in cases where public policy would thereby be promoted. 1 Stor. Eq. § 298. But where one of the parties does not concur in the illegal act, and is not *in delicto,* the Courts will grant relief, if the circumstances are such as to warrant their interposition. 1 Stor. Eq. § 300.

The complaint shows that the deed was obtained by fraud, misrepresentation and deceit, and for a consideration which was illegal, so far as *Bussell* was concerned. Under such circumstances, we maintain that the deed is absolutely void. Hilliard on Real Estate, at page 408, says: "It is said that by the common law, a deed contrary to the provisions of a general statute, or made for unlawful purposes, or to carry into effect a contract unlawful in itself, or made so by a prohibitory statute, is void *ab initio.*" See, also, to the same effect, 1 Ohio R. 403; *Phelps* v. *Decker,* 10 Mass. R. 267. It is said in 2 Greenleaf's Cruise on Real Property (4th volume of original), marginal page 24, in speaking of considerations to support deeds—"But considerations which are *against the policy of the law,* the principles of justice, or the rules of morality, are *utterly void;* it being a rule both of law and equity that *ex turpi contractu actio non oritur.*" Chancellor KENT says, in the 4th volume of his Commentaries, page 464—"It is a universal rule, that it is unlawful to contract to do that which it is unlawful to do; and every deed and every contract are equally void, whether they be made in violation of a law which is *malum in se* or only *malum prohibitum.*" But it is insisted that the parties are in *pari delicto,* and that these rules do not therefore apply to the case under consideration. We have already shown that this is a mistake. The plaintiff was guilty of no offense in purchasing the shares in the *Real Estate Company;* and the complaint predicates his claim to relief expressly on the ground that the deed was obtained by fraud and misrepresentation; that it is absolutely void; and that the illegal consideration on the part of *Bussell,* and in which the plaintiff was not implicated, was entirely abandoned and never carried out. If a vendee be guilty of actual fraud in procuring a title to land, no title passes to him, whether the sale be private or judicial. The sale is absolutely void to all intents and purposes. *Sands* v. *Codwise,* 4 Johns. 536, 598.—*Gilbert* v. *Hoffman,* 2 Watts, 66. A

void deed or contract cannot be affirmed. 5 Ind. R. 353. If the deed is absolutely void, is not the plaintiff entitled to the aid of a Court of equity to remove or set it aside? We think there can be no doubt on this point. See Stor. Eq.

The consideration was not immoral. It was not *malum in se*. The sale of lottery tickets is sanctioned by law in some of the states. It was only *malum prohibitum* so far as *Bussell* was concerned. So far as *Swain* was concerned, his purchase was neither immoral nor illegal, as before stated. The authorities all concur in stating that there is a distinction between contracts which are immoral and criminal, and such as are simply illegal and void. Courts will aid, in the latter class of cases, but not in the former. 7 Johns. 440.—11 *id*. 30.—5 *id*. 334.—If the parties to a contract cannot compel its performance, the law imposes a disability to contract. 16 Johns. 468.—Same, 486. If disabled to contract, the deed is void, and the parties are entitled to the aid of the proper Court to place them *in statu quo*.

The complaint shows that the scheme for the division of property by chance was abandoned. Even if the parties, therefore, were *in pari delicto*, the illegal purpose having been abandoned, and the deed left without any consideration whatever, the plaintiff is entitled to the relief demanded. *Bussell* holds the property in trust for *Swain*. Hill on Trustees, 108, 109, 110. A deed made to hinder or delay the vendor's creditors, is illegal and void as to creditors. But as between vendor and vendee it is binding. But the rigor of this rule is about being removed by the Courts, and very properly, we think. Where the grantor pays his debts and washes his hands of the fraud, may he not recover back his property from the vendee? Public policy demands that the Courts should aid him in returning to the paths of rectitude and honesty. The reasoning of this Court in the case of *Laney* v. *Laney*, 4 Ind. R. 152, and the authorities there cited, are conclusive, we insist, upon this point, and ought to be adopted. In this case the scheme for the division of property having been abandoned, and the shares received in consideration for the deed being valueless, is not the plaintiff entitled to relief? The illegal consideration no longer exists, the illegal purpose was abandoned, and should not the Courts favor the restoration of the parties to their just rights, under these circumstances? But really, the complaint shows that the deed was delivered upon a condition subsequent, which has never been performed. But suppose the scheme had been carried out, could not *Swain* recover back the price paid for the shares in it? No obligation can be created in the sale of tickets in a private lottery. *Clarke* v. *Havens*, 1 A. K. Marsh. 198. A bond given for the sale of tickets in an unauthorized lottery is void. *Morton* v. *Fletcher*, 2 A. K. Marsh. 137. Money paid on notes given for the purchase of tickets in a lottery unauthorized by law, may be recovered back. *Gray* v. *Marsh*, 2 A. K. Marsh. 208. If money paid for lottery tickets, or shares in a scheme for the division of property by chance, may be recovered back, and we have no doubt of it, may not land or other property given in exchange for them, be? We can see no reason why there should be any distinction between money paid and property delivered. There can be none, as there is no reason for any.

The scheme of *Bussell* was a gigantic fraud. He represented it to be a legal and honest transaction. He literally swindled the plaintiff out of his property; and yet we are told he can have no redress in the Courts of the country; that he stands in *pari delicto*, and must submit to the fleecing. The complaint and

the exhibits filed with it, and which are made a part of the record in the case, constitute the only sources of information as to the facts, as the case stands before the Court. These are admitted by the demurrer. Take the facts as stated—the fraud, the abandonment of the illegal consideration, the non-fulfillment of the conditions subsequent, the misrepresentations and deceit, and the innocence of the plaintiff—and do they not entitle the plaintiff to relief? Will not proof of the facts sustain the case, and authorize a decree setting aside the deed? This is the real touchstone of the sufficiency of the complaint.

The authorities cited by the defendants in the Circuit Court in support of their demurrer, we thought, and still think, were inapplicable. They all related to the considerations or undertakings which were clearly *mala in se*, and to cases where the maxim, *In pari delicto potior est conditio defendentis* was clearly applicable. We think no authority can be cited which will deny the plaintiff's right to relief on such a state of facts as is contained in the complaint in this case. As the facts are admitted by the demurrer, the only point for this Court to decide is, whether they are sufficient to authorize the plaintiff to maintain the action.

That Courts and legislatures are inclined to favor the views above presented, is apparent, not only from the decisions to which we have referred, and others of like effect, but from the tendency of legislation in this country. Courts of equity, if a borrower has paid the money on a usurious contract, will assist him to recover back the excess paid beyond principal and legal interest. 1 Stor. Eq. § 302. Our own legislature has authorized a person who loses money by gaming to recover it back from the winner. 1 R. S. p. 305. Indeed, we think this might be done without any statutory provision on the subject. Public policy demands that gaming and lotteries and schemes for the division of property by chance, should be broken up, and the best method to secure this desirable result is, for Courts to treat all contracts relating to either, or growing out of them, as void, and to lend their assistance to place the parties in *statu quo*. Our statute in regard to lotteries and schemes for the division of property by chance, fixes the criminality entirely upon the vendor of the tickets. 2 R. S. p. 437, § 32.

(2) The following was the argument of counsel for the appellee:

We present, mainly, but one question in the case. This being a lottery case, (which we think clearly appears, and was in the Court below admitted and agreed,) can *Swain*, the grantor of the land, on such a consideration, maintain a suit to cancel his deed and recover the premises?

Lotteries are prohibited in *Indiana*. See Constitution, art. 15, § 8; 2 R. S. p. 437, § 32. This section goes to lotteries proper, and to "schemes for the division of property to be determined by chance." This contract, we claim, is within the maxim of the law, "*Ex turpi contractu, non oritur actio*," and that the plaintiff, being the grantor of the land, is strictly within the operation of this maxim.

But we have numerous adjudicated cases, to which we confidently refer the Court. And we shall not notice these cases at any length, regarding it as a work of supererogation to do so. But we shall content ourselves with stating what seems to be the doctrine established by them, and leave to the Court to see, on an examination of the cases cited, whether they do not maintain it. That doctrine is this: That in all contracts which are immoral, or against

public policy, or against a statutory enactment, the parties being *in pari delicto*, the maxim *"potior est conditio defendentis"* applies, and no action is maintainable. *White* v. *Franklin Bank*, 22 Pick. 181.—*Inhabitants, &c.* v. *Eaton*, 11 Mass. R. 368.—*Bartle* v. *Nutt, Admr. &c.*, 4 Peters, 184.—*Hunt* v. *Knickerbocker*, 5 Johns. 327.—*Bruce* v. *Lee et al.*, 4 *id.* 411.—*Bunn* v. *Riker*, 4 *id.* 226.—*Doolin* v. *Ward*, 6 *id.* 194.—*Wilbur* v. *How*, 8 *id.* 444.—*Thomson* v. *Davies*, 13 *id.* 112.—*Utica Ins. Co.* v. *Kip*, 8 Cowen, 20.—*McCullum* v. *Gourlay*, 8 Johns. 147.—*Mount et al* v. *Waite et al.* 7 *id.* 434.—1 Story's Eq. 399, § 371.—*Id.* 314, §§ 296 to 298.—2 Pars. Cont. 252.

Cases may be cited by counsel on the other side, where these actions have been sustained; but it will be seen in those cases, that a distinction is taken, on the ground that the parties are not really *in pari delicto*, and therefore the action is maintained. So in usury cases, where the usury paid is recovered back. The Courts in these cases say that there is oppression and extortion on the one side—that the parties are not *in pari delicto* for that reason. So it has been held in one case, that where a seducer had given his bond to smother a prosecution against him, it should be held binding against him, as it appeared he had taken advantage of the female in the case. The parties were therefore not *in pari delicto*. This same question is discussed, also, in the case in 11 Mass. R., cited *supra*, at page 376.

Since preparing the foregoing, we have been shown a copy of the appellant's brief, and we notice some of its points.

"It is not contrary to the law to buy lottery tickets." In answer to this we quote the constitution again. Section 8, art. 15, says: "No lottery shall be authorized; nor shall the sale of lottery tickets be allowed." Suppose the latter clause of this section read—"nor shall the *purchase* of lottery tickets be allowed;" would the sense or spirit of it be at all changed? Certainly not. In other words, where the sale is prohibited, is not this prohibition upon the vendor and vendee alike?

But the appellant, fearing that the Court might doubt his *dictum*, proceeds to state that, "in some of the states lotteries are sanctioned and upheld by statutory provisions." That may be and no doubt is true. In one of the territories of this country, polygamy is so upheld. We do not suppose that this would be an answer to a charge of polygamy here.

\*      \*      \*      ·  \*      \*      \*      \*      \*      \*      \*

The appellant urges that the modern doctrine is, to allow relief to be granted in these cases, where by the older cases, it would have been denied. Exactly the reverse of this we understand to be the case. This subject has been discussed in 1 Story's Eq., §§ 296 to 306. In § 298, he says: "In general, (for it is not universally true,) where parties are concerned in illegal agreements or other transactions, whether they are *mala prohibita*, or *mala in se*, Courts of equity following the rule of law, as to participators in a common crime, will not, at present, interpose to grant any relief; acting upon the known maxim, *in pari delicto*," &c. In a note to this text, the author further says:

"I say *at present;* for there has been considerable fluctuation of opinion, both in Courts of law and equity, on this subject. The old cases often gave relief, both at law and in equity, where the party would otherwise derive an advantage from his iniquity. But the modern doctrine has adopted a more

severely just, and probably politic and moral rule, which is, to leave the parties where it finds them, giving no relief, and no countenance to claims of this sort."

This note is supported by a long list of authorities at law and in chancery, to which this Court is referred. And again in the same section, 268, it is further said that "the suppression of illegal contracts is far more likely, in general, to be accomplished by leaving the parties without remedy against each other, and by thus introducing a preventive check, naturally connected by a want of confidence, and a sole reliance upon personal honor. And so, accordingly, the modern doctrine is established." With this we are willing to rest, as to what is the modern doctrine in the question under consideration, and also as to what public policy is in regard to the same matter.

We agree with the counsel for the appellant, that "public policy demands that gaming and lotteries and schemes for the division of property by chance, should be broken up;" but we wholly dissent from their conclusion as to the best mode of doing this. They say, "give assistance to place the parties in *statu quo.*" We think not, and we offer the reasoning of Justice STORY, and the authorities cited by him, as well as all the authorities cited by us, in support of our view.

*May Term,*
## 1858.