In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-3667

TOM GEORGE, CHRIS VITRON, LORI CHAPKO and
EDWARD SNEAD, on behalf of themselves and
all others similarly situated,

*Plaintiffs-Appellants*,

*v.*

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 08-CV-1684–**William T. Lawrence**, *Judge*.

ARGUED MARCH 29, 2010—DECIDED JULY 16, 2010

Before CUDAHY and KANNE, *Circuit Judges*, and
DARRAH, *District Judge*.[*]

DARRAH, *District Judge.* Plaintiffs brought this proposed
nationwide class action against the National Collegiate

---

[*] Honorable John W. Darrah, United States District Judge
for the Northern District of Illinois, is sitting by designation.

Athletic Association ("NCAA") and Ticketmaster, alleging that both defendants operated illegal lotteries to sell and distribute tickets for certain Division I championship tournaments. The NCAA moved to dismiss Plaintiffs' Second Amended Complaint. The district court dismissed all claims with prejudice, and this appeal followed.

## BACKGROUND

The named plaintiffs are residents of Arizona, Oregon, and New York. Each applied for tickets to NCAA men's basketball games through NCAA-owned websites, and each of them forfeited service fees when they were not selected as winners in the process. Plaintiffs claim the NCAA's ticket-distribution system, which the NCAA has operated since at least 1994, is an illegal lottery and a means of increasing revenues at Plaintiffs' expense. Plaintiffs believe the number of potential class members to be in the hundreds of thousands.

The ticket-distribution system has been used for *inter alia* the NCAA's Division I men's and women's basketball and hockey championship tournaments. In their Second Amended Complaint, Plaintiffs specifically describe the application of the NCAA's system for distributing tickets to the 2009 Men's Basketball Tournament. For the final games of that tournament, during which the top four teams (the "Final Four") compete for the Championship title, Plaintiffs explain the process as follows: Each person who applied for tickets to Final Four games submitted a single application with up to ten entries.

Each entry was a chance to win, at the most, two tickets and required a payment of a six-dollar "non-refundable handling fee." An applicant could win only once. Nonetheless, each applicant was required to submit the full face value of the tickets for each entry submitted. Accordingly, in order to maximize the chances for winning a single pair of $150 tickets, an applicant would have to submit $3,060 (the face value of ten pairs of tickets plus a six-dollar handling fee for each of ten entries). If the applicant were to win, he would receive a pair of tickets via overnight mail and, eventually, a $2,700 refund (the total ticket price for the remaining nine entries). The $60 in handling fees would be forfeited to the NCAA. If the applicant were to lose, he would receive a $3,000 refund (his entire up-front investment minus the handling fees).

Plaintiffs allege that these retained "service" or "handling" fees, as well as the NCAA's use of the applicants' money, constitute consideration for a chance to win the right to purchase "highly prized" tickets for priority seating at venues that "are much too small to meet ticket demand" and that the NCAA's ticket-distribution system constitutes an unlawful lottery. (Second Am. Compl. ¶¶ 46-47.)

Plaintiffs allege that "the number of applicants greatly exceeds the number of tickets on virtually every occasion," that the NCAA falsely advertises the availability of certain seats and "manipulate[s]" the purportedly random drawings "to accommodate business needs," and that the resale market value of the tickets is high due to their

scarcity. (Second Am. Compl. ¶¶ 25, 47, 49.) Plaintiffs further allege that the "service fees" and "handling fees" charged by the NCAA bear "no relationship to the costs of running the lottery and grossly exceed[] any costs associated with the lottery." (Second Am. Compl. ¶ 41.) According to Plaintiffs, the NCAA reaps huge profits by holding and using the money received from applicants (approximately $100 million in 2008).

Plaintiffs' Second Amended Complaint asserts six claims, five of which remained at the time the NCAA filed its motion to dismiss.[1] Count I seeks a declaratory judgment that the NCAA's ticket-allocation process constitutes illegal gambling in violation of Indiana law;[2] Count II is a claim for unjust enrichment; Count III alleges a civil conspiracy between the NCAA and Ticketmaster; Count V is for monies had and received; and Count VI claims the NCAA violated the Indiana Deceptive Consumer Sales Act ("DCSA"), codified at Ind. Code § 24-5-0.5-1 *et seq.*

The district court dismissed the entire Second Amended Complaint with prejudice on the NCAA's Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

---

[1] With the exception of Count III, all counts were later dismissed against Ticketmaster pursuant to a settlement agreement. Because Count IV was asserted against Ticketmaster only, it is not at issue.

[2] Plaintiffs also cite California prohibitions against private lotteries. Plaintiffs' appeal, however, is based on Indiana law only.

**LEGAL STANDARD**

A district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is reviewed *de novo*. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). All well-pleaded facts are accepted as true, and all reasonable inferences are drawn in the plaintiff's favor. *Id.* The allegations in the complaint "must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *Equal Employment Opportunity Comm'n v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 1973 n.14 (2007)).

**ANALYSIS**

*Lottery*

Indiana law defines a lottery as "a scheme for the distribution of prizes by lot or chance." *Lesher v. Baltimore Football Club*, 496 N.E.2d 785, 789 (Ind. Ct. App. 1986) (*Lesher*), *vacated in part on other grounds*, 512 N.E.2d 156 (Ind. 1987), (quoting *Kaszuba v. Zientara*, 495 N.E.2d 761, 763 (Ind. App. Ct. 1986); *Tinder v. Music Operating, Inc.*, 142 N.E.2d 610, 614 (Ind. 1957) (*Tinder*)). These cases identify three elements necessary to establish a lottery: (1) a prize, (2) an element of chance, and (3) consideration for the chance to win a prize. The NCAA does not dispute this.

The NCAA argues that its distribution process only grants an *opportunity* to purchase tickets at full price,

which the NCAA contends is not a prize. This argument misconstrues the nature of the ticket-distribution process as pled by Plaintiffs.

As detailed above, Final Four games, in particular, required a significant up-front investment—as much as $3,060. Included in this cost were "non-refundable handling fees." Unsuccessful applicants were refunded a portion of their up-front investment at some later point in time, but all handling fees were retained by the NCAA.

In dismissing Plaintiffs' Second Amended Complaint, the district court cited *Lesher*, a case from the Indiana court of appeals, which held that a distribution scheme for season tickets to Indianapolis Colts games did not constitute an unlawful lottery. 512 N.E.2d at 789-90.

In *Lesher*, all applicants submitted the face value of the tickets sought plus a handling fee. *Id.* at 787-88. Winners were selected at random. *Id.* Losers received a full refund of the ticket price *and the handling fee*. *Id.* at 787-88. Defining a prize as "something of more value than the amount invested," the *Lesher* court held that the applicants merely "invested the price of the tickets and received in exchange either the tickets or the entire amount invested," such that "those receiving tickets got nothing of greater value than those who received refunds." *Id.* at 789-90. Because the court found that no prize had been awarded, it held that the scheme was not a lottery. *Id.* at 790.

Here, Plaintiffs allege they were required to invest the additional "service fee" or "handling fee" of six to ten

dollars per ticket or entry, which bears no relation to the NCAA's actual cost in administering the ticket-distri-bution process *and was not refunded*. Win or lose, the service fee was forfeited by all entrants and retained by the NCAA. Thus, Plaintiffs have alleged the existence of consideration not present in *Lesher*, where the handling fee was refunded to those who did not secure tickets.

Plaintiffs have also alleged the existence of a prize not present in *Lesher*. They specifically allege that the scarcity of the tickets makes those tickets far more valuable than the cost of purchase. Although the plain-tiffs in *Lesher* attempted to make a similar argument, that case was decided on a motion for summary judg-ment, and the court determined that the plaintiffs had not presented evidence necessary to establish that fair-market value was higher than face value. *See id.* at 789 ("Because they did not come forward with evidence disputing the fact of value and because the court had evidence as to the market value of the tickets, Lesher and Dillon's argument on appeal regarding the value of scarce commodities is of no benefit to them now."). This case, by contrast, was dismissed on a motion chal-lenging the sufficiency of the complaint. To defeat that motion, Plaintiffs need only have alleged that the fair-market value of the tickets exceeded their face value such that those tickets constitute something of more value than the amount invested. Plaintiffs have done so.

The NCAA also argues that Plaintiffs have not alleged an element of chance. In Indiana, the "chance" element

is met if "the winning of a prize is dependent primarily on, if not solely, upon chance [rather than skill]." *Tinder*, 142 N.E.2d at 615. For an event in which the demand for tickets exceeds the supply and the right to purchase tickets is allocated at random, the element of chance is plain. Applicants for NCAA tickets do not obtain their reward through any exercise of skill or judgment. Nonetheless, the NCAA argues that its ticket-distribution scheme lacks any element of chance because a random drawing occurs only if the demand for tickets to a given event exceeds the supply. Therefore, an element of chance is not *necessarily* present. But Plaintiffs specifically allege that tickets are highly prized and that the venues hosting the events are "much too small to meet ticket demand." (Second Am. Compl. ¶ 47.) The fact that all applicants may win tickets for some events does not obviate Plaintiffs' claims that they paid money to enter drawings for valuable tickets where the demand for tickets *did* exceed the supply.

Thus, Plaintiffs have alleged all elements of a lottery: they paid a per-ticket or per-entry fee (consideration) to enter a random drawing (chance) in hopes of obtaining scarce, valuable tickets (a prize).

The NCAA also argues that even if its ticket-distribution process is a lottery, it is not unlawful because it fits within an exception to Indiana's statutory definition of "gambling." Under Indiana law, it is unlawful for a person to knowingly or intentionally engage in gambling, Ind. Code § 35-45-5-2(a), which is defined as "risking money or other property for gain, contingent in whole

or in part upon lot, chance, or the operation of a gambling device; but it does not include participating in: . . . bona fide business transactions that are valid under the law of contracts," Ind. Code § 35-45-5-1(d).

Clearly, the exception in the statute was intended to exclude such activities as regulated investing from the definition of gambling. *See, e.g., Auten v. State*, 542 N.E.2d 215, 222 (Ind. Ct. App. 1989) (stating that activities of a brokerage firm's purchasing stocks on margin would fall under the bona-fide-business-transaction exception under Indiana law); Christopher T. Pickens, Note, Of Bookies and Brokers: *Are Sports Futures Gambling or Investing, and Does It Even Matter?*, 14 Geo. Mason L. Rev. 227, 248 (2006) (discussing Wyoming's nearly identical exclusion of "bona fide business transactions which are valid under the law of contracts" as a legislative effort to exclude investing activities from the statutory definition of "gambling") (quoting Wyo. Stat. Ann. § 6-7-101(a)(iii)(B)-(C)).

Moreover, another statutory provision makes it unlawful to conduct a lottery without regard for the definition of "gambling" provided in section 35-45-5-1. *See* Ind. Code § 35-45-5-3(a)(4) ("A person who knowingly or intentionally . . . conducts lotteries . . . commits professional gambling, a Class D felony. . . ."); *Lashbrook v. State*, 550 N.E.2d 772, 776-77 (Ind. Ct. App. 1990) (affirming conviction for professional gambling under section 35-45-5-3(a)(4) based on an "airplane investment program" held to be an illegal lottery). Indiana proscribes *all* lotteries except those run by the State, where profits

go to benefit Indiana residents. *See L.E. Servs., Inc. v. State Lottery Comm'n*, 646 N.E.2d 334, 339-40 (Ind. Ct. App. 1995) ("With the exception of lotteries conducted by the State Lottery Commission, lotteries are considered illegal gambling in Indiana."). Because Plaintiffs have sufficiently pled that the NCAA conducted a lottery, the bona-fide-business-transaction exception to the statutory definition of gambling is of no effect.

### In Pari Delicto

Under the equitable doctrine of *in pari delicto*, "where the wrong of both parties is equal, the position of the defendant is the stronger." *Knauer v. Jonathan Roberts Fin. Group, Inc.*, 348 F.3d 230, 236 (7th Cir. 2003) (quoting *Theye v. Bates*, 337 N.E.2d 837, 844 (Ind. Ct. App. 1975) (*Theye*)). It literally means "of equal fault." *Theye*, 337 N.E.2d at 844 (quoting *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 135 (1968)). Thus, "where both parties are *in delicto* . . . it does not always follow that they stand *in pari delicto*, for there may be, and often are, very different degrees in their guilt." *Stewart v. Wright*, 147 F. 321, 329 (8th Cir. 1906) (quoting 1 Story, Eq. Jur. § 300) (italics added).

Relying on the application of that doctrine in *Lesher*, the district court dismissed most of the counts in Plaintiffs' Second Amended Complaint based on its conclusion that Plaintiffs were equally at fault for their participation in the NCAA's scheme.

But the language in *Lesher* relied upon by the district court was dicta, which, in turn, relied on *Swain v. Bussell*,

10 Ind. 438 (1858) (*Swain*). In *Swain*, the Indiana Supreme Court held that the defendant's scheme for the distribution of real estate through a random drawing was an unlawful lottery prohibited by Indiana statute and constitution but that the plaintiff was not entitled to relief because he was aware of the scheme's unlawful nature and had actually arranged with the defendant to violate the law. *Id.* at 443.

Here, the Second Amended Complaint does not state or imply a mutual arrangement to violate the law. Nor does it reflect that Plaintiffs knew or had reason to suspect they were agreeing to participate in an illegal lottery at the time they sought to purchase tickets. When all reasonable inferences are drawn in Plaintiffs' favor, *Swain* does not support dismissal at the pleadings stage.

Indiana law makes it unlawful to conduct lotteries or otherwise gamble *knowingly*. Ind. Code §§ 35-45-5-2, 35-45-5-3(a)(4). As alleged, the NCAA's act of knowingly conducting an unlawful lottery demonstrates a greater degree of fault than Plaintiffs' act of unwittingly entering that lottery. As such, the district court erred in holding that the doctrine of *in pari delicto* bars Plaintiffs from seeking relief from the court.

*Remaining Counts*

After determining that Plaintiffs were barred from challenging the NCAA's alleged lottery by the doctrine of *in pari delicto*, the district court listed a number of deficiencies in Plaintiffs' DCSA claims. Plaintiffs' re-

maining counts were not addressed. Without elaboration, the entire action was dismissed with prejudice.

All of Plaintiffs' claims, however, incorporate—and, to some extent, rely on—all of the preceding allegations, including the lottery claim. As discussed above, Plaintiffs have sufficiently alleged that the NCAA operated an unlawful lottery. Accordingly, the district court's order of dismissal must be reversed as to *all* counts remaining in Plaintiffs' Second Amended Complaint.

## CONCLUSION

For the reasons stated above, the judgment of the district court is REVERSED, and the case is REMANDED for further proceedings consistent with this opinion.

CUDAHY, *Circuit Judge*, dissenting. I respectfully dissent from the conclusion of the majority that the mode of distribution of certain sought-after tickets for sports events, as pleaded, is technically an illegal "lottery." This case is indistinguishable in relevant respects from *Lesher v. Baltimore Football Club*, 496 N.E.2d 785 (Ind. Ct. App. 1986), *vacated in part on other grounds*, 512 N.E.2d 156 (Ind. 1987). The principal ground for distinction asserted by the majority is that in *Lesher* the application

fees of the losing applicants were returned while in the present case they are not. This may be a basis for finding an overcharge here, but it is hardly grounds for elevating the present procedure to the status of an illegal "lottery."

*Lesher* relied primarily on a finding of *in pari delicto* to invalidate that lawsuit and this is an equally valid ground for dismissing this one. With respect to an almost identical scheme in *Lesher*, the Indiana Court of Appeals stated:

> [P]laintiffs claim the ticket allocation plan constituted a constitutionally proscribed lottery, yet they participated in the plan, knowing that a "blind lottery" was possible. Even if we were to conclude that the plan did constitute a constitutionally proscribed lottery, we would note the words of our Supreme Court in *Swain v. Bussell*, 10 Ind. 438, 442 (1858): "If the plaintiff, with the facts before him, saw proper to become a participant in such an illegal and prohibited transaction . . . he is not in condition to ask . . . the aid of a court."

*Lesher*, 496 N.E.2d at 790 n.1. In predicting how the Indiana Supreme Court would decide a state-law issue, we can obviously look to the Indiana Court of Appeals as persuasive authority. *See, e.g.*, *AAR Aircraft & Engine Group, Inc. v. Edwards*, 272 F.3d 468, 470 (7th Cir. 2001) (observing that, where the state supreme court has not spoken, "the decisions of the state's intermediate appellate courts are authoritative unless we have a compelling reason to doubt that they have stated the law correctly"). I see no reason why *Lesher* should not be

treated as authoritative in this instance and I find the purported distinction regarding the return of fees to be without significance to the question whether the plaintiffs participated in the ticket-distribution mechanism, "knowing that a 'blind lottery' was possible." *Lesher*, 496 N.E.2d at 790 n.1. Although the cited statement by the Indiana Court of Appeals was technically dicta, I find the logic persuasive as applied to the present case.

The efforts by the majority to rely on the relative culpability of the defendant compared with that of the plaintiffs or between a motion for summary judgment and a motion to dismiss are also without significance.

In addition, the argument that the tickets awarded, because of their scarcity, are more valuable than the price originally charged for them is misleading. Face value is in fact the value realized by the issuer. After allocation, they acquire, as a result of the very process of allocation, a resale value, not necessarily to be realized, and for that reason irrelevant.

There are other reasons for excluding this process of ticket distribution from being classified as an illegal "lottery." One of these is the statutory exemption for "bona fide transactions that are valid under the law of contracts." Ind. Code § 35-45-5-1(d). This is a very open-ended exemption that is easily applicable to this device—incidental to allocating scarce tickets for popular sports events.