Parvin E. DAY, Ronald E. Snider, Allan L. Hanft, Carl E. Bozsa, Charles R. Pruett, Michael Day, Deborah Forsythe, Joseph J. Church and Howard Paper Mills, Inc., Appellants (Defendants-Counterplaintiffs Below),

v.

BICKNELL MINERALS, INC. and Union Mines, Inc., Appellees (Plaintiffs-Counterdefendants Below).

No. 4–1084A283.

Court of Appeals of Indiana, Fourth District.

July 15, 1985.

Rehearing Denied Aug. 28, 1985.

David P. List, J. Andrew Schlickman, David B. Johnson, Sidley & Austin, Chicago, Ill., H. Brent Stuckey, Hart, Bell, Deem, Ewing & Stuckey, Vincennes, for appellants.

Theodore J. Nowacki, Daniel C. Emerson, Steven K. Huffer, Bose McKinney & Evans, Indianapolis, Rabb Emison, Emison, Emison, Doolittle & Kolb, Vincennes, for appellees.

CONOVER, Judge.

Defendants and cross-complainants, Day, et al. (shareholders), appeal the entry of partial summary judgment against them on their cross-complaint.

We affirm.

ISSUE

At issue is whether the trial court erred by entering partial summary judgment in favor of Bicknell on shareholders' cross-complaint.

FACTS

In the summer of 1980, Union Miniere, S.A., a Belgian corporation, and its subsidiary, Union Mines, Inc., a Maryland corporation, (together U.M.) began negotiating with the shareholders of Bicknell Minerals, Inc. (BMI) for the purchase of BMI. Throughout these negotiations U.M. was represented by Francois J. Breyer. The shareholders were represented by Parvin E. Day, then a director and president of BMI. Also he was the sole owner of Parday Corporation which managed BMI. BMI is an Indiana corporation conducting coal mining operations.

At the time, BMI was owned by one corporate and eight individual shareholders. It was indebted to two separate banks in the amount of $8.8 million. All shareholders except Howard Paper, Inc. were individually liable for these debts. No principal or interest had been paid to these banks on this indebtedness.

BMI had but one customer for its coal, Public Service of Indiana (PSI). Seldom had it met the production quotas specified in its contract with PSI. During the course of these negotiations, the promissory notes representing the indebtedness due the banks were declared in default. BMI was called upon to cure the default or face acceleration of the amounts due.

The negotiations between the shareholders and U.M. were long and arduous but resulted in an oral agreement on December 23 between Day and Breyer subject to the result of discussions yet to be had between U.M. and PSI, and the approval of each negotiator's principals. In pertinent part, the agreement called for payment of $8.8 million to the two banks, release of the shareholders' personal obligations on the notes, and payment of $2 million in cash to the shareholders at closing.

However, following the discussions contemplated and further discussions with the banks, U.M.'s board of directors refused to ratify the tentative agreement. It ordered continued "tough" negotiations.

All parties were aware

(a) of impending action by the banks regarding that indebtedness, and

(b) all shareholders, except Howard Paper, Inc., were personally liable on the notes.

Discussions continued.

On February 5, 1981, a written agreement (the February 5 agreement) was signed by the parties. In pertinent part, it called for payment of the bank notes by UMI, release of the individual shareholders' liabilities thereon, and payment of $2 million to the former shareholders from future cash flow of BMI.

Later, BMI, now owned by Union Mines (BMI/UM) sued the former shareholders seeking (1) declaratory and injunctive relief, and (2) specific performance under the February 5 agreement. That suit resulted in a stipulated agreement not directly relevant here.

During this litigation a second amended counterclaim was filed by the shareholders. It sought (1) reformation of the February 5 agreement to make it conform to the oral agreement of December 23, 1980, and (2) their costs.

On motion of BMI/UM, partial summary judgment was entered in favor of BMI/UM on shareholders' second amended counterclaim. Shareholders appeal.

Additional facts as necessary are stated below.

DISCUSSION AND DECISION

■ With regularity we have restated the standard of review in summary judgment cases. Recently, we said

Under Ind. Rules of Procedure, Trial Rule 56, summary judgment is appropriate only where there are no issues of material fact and the moving party is entitled to judgment as a matter of law.

When reviewing the grant of a motion for summary judgment we stand in the shoes of the trial court. We must determine whether any genuine issue of material fact exists and whether the law was correctly applied. We must liberally construe all evidence in favor of the non-movant and resolve any doubt as to the existence of a genuine issue against the proponent of the motion. A fact is material if it facilitates resolution of any of the issues involved. On appellate review the trial court's judgment will be affirmed on any theory or basis found in the record which supports the trial court's judgment. A fact is "material" for summary judgment purposes, if its resolution is decisive of the action or of a relevant secondary issue. (Citations omitted).

*Penwell v. Western and Southern Life Ins. Co.* (1985), Ind.App., 474 N.E.2d 1042,

1043, 1044. Despite conflicting facts and inferences on some elements of a claim, summary judgment may be proper where there is no conflict regarding facts dispositive of the litigation. *Raymundo v. Hammond Clinic Association* (1983), Ind., 449 N.E.2d 276, 280 *citing Barnd v. Borst* (1982), Ind.App., 431 N.E.2d 161, 164–165. *Cf. Cruell v. Platt* (1984), Ind.App., 471 N.E.2d 1211, 1214 (*reh. denied*).

Appellants contend the trial court granted partial summary judgment despite the existence of issues of material fact as to economic duress and undue influence. In addition, they claim the trial court (a) should have reformed the February 5 agreement, and (b) improperly weighed the evidence.

■ The tentative agreement of December 23 is not enforceable. It was merely a part of the continuing negotiations. A sale of securities is enforceable under IND. CODE 26–1–8–319 [1] only when there is an agreement in writing, delivery of or payment for the shares, or an admission. Here in addition, the undisputed evidence shows the shareholders knew any tentative agreement required the approval of UM's Board. Parvin Day, the shareholders' representative throughout the negotiations, acknowledged that understanding in the following colloquy at his deposition:

Q Specifically, sir, was it your understanding that ... did you understand Mr. Breyer would have to take any proposals back to some higher authority to attain their consent and approval?

A Well, I would assume that anything would have to be approved by the board.

Q Well, did he ever tell you that he had to report to his principals in Brussels before being able to commit to a deal?

A Oh, yes, sure.

Q That was clear from the start, wasn't it?

A Maybe not necessarily from the start but at some point he said he had to have approval from Brussels.

Q I assume it came as no surprise to you?

A No.

■ The February 5 contract was signed by all parties to the transaction. Any prior oral agreement was merged into the final written document. Unless obtained by fraud or duress, the written contract is the agreement by which the parties are bound. *See, e.g. Oiler v. Gard* (1864), 23 Ind. 212, 217; *Van Wy v. Clark* (1875), 50 Ind. 259, 266; *Keystone Square v. Marsh Supermarkets, Inc.* (1984), Ind.App., 459 N.E.2d 420, 422; *Diddel v. American Security Co.* (1928), 94 Ind.App. 639, 643, 161 N.E. 689, 690.

Shareholders next claim the course of conduct pursued by UM during these negotiations constituted economic duress and undue influence. Not so, in this case.

■ Undue influence is the exercise of control over a person sufficient to destroy his free agency and constraint as to what he would not have done without such control. *See, e.g. Hunter v. Milhous* (1974),

---

1. IND.CODE 26–1–8–319 provides

   A contract for the sale of securities is not enforceable by way of action or defense unless
   (a) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or
   (b) delivery of the security has been accepted or payment has been made but the contract is enforceable under this provision only to the extent of such delivery or payment; or
   (c) within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under paragraph (a) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten (10) days after its receipt; or
   (d) the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract was made for sale of a stated quantity of described securities at a defined or stated price.

159 Ind.App. 105, 123, 305 N.E.2d 448, 459. A contract procured from one in a situation of distress and necessity by another who stands in a relation of confidence or who is in a situation of advantage may be avoided. *See, e.g., McClamroch v. McClamroch* (1985), Ind.App., 476 N.E.2d 514, 520; *Lucas v. Frazee* (1984), Ind.App., 471 N.E.2d 1163, 1166; *Middelkamp v. Hanewich* (1970), 147 Ind.App. 561, 567, 263 N.E.2d 189, 192–193. Here there is no confidential relationship existing between the parties from which a presumption of undue influence could arise.[2]

The facts here show sophisticated businesses and businessmen dealing with each other on behalf of their principals. UM was not in a dominant position, the shareholders were free to deal with anyone desiring to purchase their shares. Indeed, the evidence presented shows they had explored a possible sale to at least one other entity.

■ The shareholders, however, claim a confidential relationship existed because of UM's access to BMI's business records. The decision to allow access to business records in the hope of attracting a purchaser lay solely with the shareholders. It created no confidential relationship.

Next, they claim a cooperative venture between the shareholders and UM existed. The facts, viewed in a light most favorable to the shareholders, show at most mere discussion of such a venture, some minimal inquiry as to acquisition of other mines, and a future relationship between UM and Parday Corp., the separate management corporation solely owned by Parvin Day. No such venture ever was formed.

There was no confidential relationship between these parties, nor did UMI assert undue influence.

■ The shareholders claim economic duress and deprivation of their will instigated by UM. The facts here do not support such claim.

Our supreme court has noted a modern tendency to permit the avoidance of contracts coerced by fear of a wrongful act by the other party to the transaction. It said the ultimate fact to be determined is whether the purported victim was deprived of the *free exercise of his will. Raymundo v. Hammond Clinic Association* (1983), Ind., 449 N.E.2d 276, 283. No such showing is made here. UM merely conducted separate negotiations with both the shareholders and the banks. More importantly, UM had nothing to do with Bicknell's failure to pay the notes prior to UM's purchase of the shares. There is no evidence nor reasonable inference UM had any control over the declaration of default by the financing banks. Undoubtedly UM took full advantage of the dire straits in which it found the shareholders during negotiations, but no act of UM had placed the shareholders in their precarious position. In short, there is no evidence of any wrongful act or coercion of the shareholders by UM.

The shareholders cite *Litten v. Jonathon Logan, Inc.* (1972), 220 Pa.Super. 274, 286 A.2d 913 in support of their position. It is, however, readily distinguishable. In *Litten* (also a stock sale case), after the sellers transferred their shares and waived or relinquished rights to repayment of loans made to the purchased corporation, the *purchasers* placed the sellers in a financial crisis by failing to perform their oral agreement to pay creditors to whom the sellers were personally liable. Having placed the sellers in default, the purchasers then forced a written agreement upon the sellers significantly differing from the oral one. Here, no act or omission of UM's placed the shareholders in economic jeopardy before the written agreement was executed. Further, the concurrent performance of the parties released the shareholders from their personal liabilities as to the $8.8 million in loans.

No acts here were wrongful, nor did they deprive the shareholders of the exercise of

---

**2.** Attorney-Client; Guardian-Ward; Principal-Agent; Pastor-Parishioner; Husband-Wife; Par-ent-Child, etc. *See, e.g. Lucas v. Frazee* (1984), Ind.App., 471 N.E.2d 1163, 1166–1167.

free will. Through no fault of UM, the shareholders simply were faced with two choices: they could take the deal it offered or face action by the banks. The shareholders were in economic peril because their company failed to meet its obligations, not by virtue of any course of conduct attributable to UM.

Affirmed.

MILLER, P.J., and YOUNG, J., concur.