**R.W. LESHER and Stephen Dillon, Appellants (Plaintiffs Below),**

v.

**The BALTIMORE FOOTBALL CLUB d/b/a Indianapolis Colts, Appellee (Defendant Below).**

No. 4–785A212.

Court of Appeals of Indiana, Fourth District.

Aug. 26, 1986.

Rehearing Denied Oct. 30, 1986.

Gary P. Price, Jennifer L. Graham, Lewis, Kappes, Fuller & Eads, S. Sargent Visher, Choate, Visher & Haith, Indianapolis, for appellants.

William M. Evans, Alan W. Becker, Bose, McKinney & Evans, Indianapolis, for appellee.

YOUNG, Judge.

R.W. Lesher and Stephen Dillon appeal a trial court entry of summary judgment in favor of The Baltimore Football Club d/b/a Indianapolis Colts. Lesher and Dillon raise the following issues on appeal:

1) Did the trial court err in determining, as a matter of law, that the Colts' ticket allocation plan did not constitute a constitutionally proscribed "lottery"?

2) Did the trial court err in determining, as a matter of law, that the Colts did not violate the deceptive practices act?

3) Did the trial court err in determining, as a matter of law, that the Colts did not commit civil theft under IND.CODE 34–4–30–1?

4) Did the trial court err in failing to consider Lesher and Dillon's equitable claim for damages for unjust enrichment?

5) Are the Colts entitled to appellate attorney's fees pursuant to Ind.Rules of Procedure, Appellate Rule 15(G)?

We affirm and award appellate attorney's fees.

The parties stipulated to the following facts. The Colts are a professional football team which relocated in Indianapolis in 1984. The Colts, or authorized agents or representatives thereof, were responsible for allocation of and reserved the right to allocate 1984 season tickets to regularly scheduled Colts home football games.

In response to a public solicitation for season tickets, Lesher submitted a check in the amount of one thousand one hundred thirty-six dollars ($1,136.00), and Dillon submitted a check in the amount of one hundred fifty-five dollars ($155.00). The checks were negotiated and the proceeds deposited in the Colts' account. The proceeds of Lesher's and Dillon's checks were held in the Colts' account and invested for a period of time. The Colts received investment income on the proceeds.

Lesher received the tickets for which he applied. Although Dillon did not receive tickets, he received a refund in the amount

of one hundred fifty-five dollars ($155.00) representing the principal amount plus the handling fee. None of the purchasers, including Lesher and Dillon, participated in determining the allocation process for the tickets, and none of them was required to exercise any degree of judgment or skill regarding the allocation process.

According to a seating manifest prepared by the Capital Improvements Board of Managers of Marion County in August of 1984, there are approximately 60,500 seats available at the Hoosier Dome, the arena in which the Colts play their games. An April 18 newspaper article accurately reflected a statement of an authorized agent of the Colts that approximately 3,500 single-game tickets would be reserved for sale to the general public prior to each home game. Therefore, approximately 57,000 seats were available for sale as season tickets. Of those, approximately 52,000 seats were allocated through the public solicitation allocation process.

The April 18 newspaper article was attached to the Stipulations of Fact as an exhibit. The article stated that no definite plan had been formulated as to how to allocate the tickets in the event demand for tickets exceeded supply, but a "blind lottery" would be possible. The article quoted Colts owner Bob Irsay's response to the question of how quickly the orders would be processed:

'As fast as we can,' said Irsay. 'We know people want to make plans. Hopefully we'll have something within two or three weeks.'

A ticket application form appeared in the newspaper on April 18. Both the form and the article stated that tickets would be distributed approximately two weeks before the August 11 home exhibition game. The form also stated that "your cancelled check is your receipt." The parties stipulated that the application form attached as an exhibit was a true and correct copy of the one disseminated to season ticket applicants.

Lesher and Dillon submitted the affidavit of Bruce Clark, who stated that he sent the Colts a letter cancelling his ticket order and requesting a refund. The envelope was stamped "RETURN TO SENDER," was sealed with tape, and was returned to Clark. The copy of the letter attached to the affidavit reveals that Clark did not include a zip code when he addressed the envelope.

The Colts submitted the affidavit of Larry Hall, the ticket manager. He stated that ticket demand was approximately three times the supply. Those not receiving tickets received a refund, including the handling fee, and the tickets were distributed two weeks before the first home exhibition game, as stated. He also stated that the Colts received no demand from Lesher or Dillon regarding a refund.

The parties filed cross motions for summary judgment. The parties agreed:

that the facts encompassed within these stipulations, together with those contained in any affidavits submitted by the parties, are sufficient for this Court to rule on the pending motions for summary judgment and that no further facts or testimony will be submitted to the Court or should be considered by the Court for purposes of ruling on these motions.

(R. 251–252) Lesher and Dillon challenge the trial court's entry of summary judgment in favor of the Colts on all issues.

Summary judgment is appropriate only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Ind. Rules of Procedure, Trial Rule 56; *Bernhardt v. State* (1985), Ind.App., 479 N.E.2d 1367, 1368. In determining whether a genuine issue of material fact exists, the facts set forth by the opponent must be taken as true, and all doubts are resolved against the proponent of the motion. T.R. 56(C); *First Savings and Loan Association v. Treaster* (1986), Ind.App., 490 N.E.2d 1149, 1151.

Lesher and Dillon contend that genuine issues of material fact exist and that inferences and doubts were resolved in favor of the Colts. A fact is material if it

affects the outcome of the litigation. *Ewing v. Board of Trustees* (1985), Ind.App., 486 N.E.2d 1094, 1097. Entry of summary judgment is appropriate despite conflicting facts and inferences on some elements of a claim if there is no dispute or conflict regarding facts dispositive of the action. *Ewing, supra* at 1097–1098; *Day v. Bicknell Minerals, Inc.* (1985), Ind.App., 480 N.E.2d 567, 570. Therefore, existence of disputed facts in this case will not preclude entry of summary judgment in favor of the Colts if some undisputed fact requires the entry of judgment in the Colts' favor as a matter of law. *See Taylor v. Landsman* (1981), Ind.App., 422 N.E.2d 403, 407, *rehearing denied* 425 N.E.2d 218.

Specifically, Lesher and Dillon first contend the trial court erred in determining, as a matter of law, that the ticket allocation plan did not constitute a lottery within the meaning of Ind. Const. art. XV § 8. That section provides: "No lottery shall be authorized; nor shall the sale of lottery tickets be allowed." A lottery is "a scheme for the distribution of prizes by lot or chance." *Kaszuba v. Zientara* (1986), Ind.App., 495 N.E.2d 761, 763; *Tinder v. Music Operating, Inc.* (1957), 237 Ind. 33, 142 N.E.2d 610, 614 (quoting Webster's New International Dictionary).

In *State v. Nixon* (1979), 270 Ind. 192, 384 N.E.2d 152, our supreme court held that a pari-mutuel system constituted a constitutionally proscribed lottery. The majority concluded:

that the concern of those who drafted and adopted our Constitution, including Article XV, section 8, was to minimize the harmful effects of gambling by sheltering the people from gaming enterprises promoted and operated for monetary gain by those who, because of the methods employed, are, in essence, purveyors rather than players.

*Nixon, supra* 384 N.E.2d at 161. The focus of the *Nixon* case was on the element of "chance," and the court held that, notwithstanding the fact:

that a degree of skill is involved in selecting the horses most likely to perform

well, the unpredictability of the odds to be paid and the limited predictability of the performance of the animals combine to provide the degree of "chance" required to meet the traditional textbook definitions of the term "lottery." However, whether or not it is a lottery, in the classical sense, is immaterial. Its effects are precisely those sought to be prevented by Article XV, section 8; and, it is, therefore, a "lottery" within the meaning of that term as therein employed.

*Nixon, supra* 384 N.E.2d at 161.

It is undisputed that Lesher and Dillon were not required to exercise skill or judgment in order to get season tickets. The question here, however, is whether there was a prize at stake.

Lesher and Dillon contend that the fact of value of the tickets was not established. The trial court had before it the order form, which listed the prices of the tickets. Applicants who were willing to pay the stated prices for tickets mailed in the forms, accompanied by checks. Thus, the court had before it evidence as to the price voluntarily paid by the purchasers, e.g., the market price. *See Indiana Tri-City Plaza Bowl, Inc. v. Estate of Glueck* (1981), Ind.App., 422 N.E.2d 670, 679.

Once the Colts had moved for summary judgment and supported their motion, Lesher and Dillon were required to come forward and demonstrate where questions of material fact existed. *Conard v. Waugh* (1985), Ind.App., 474 N.E.2d 130. Because they did not come forward with evidence disputing the fact of value and because the court had evidence as to the market value of the tickets, Lesher and Dillon's argument on appeal regarding the value of scarce commodities is of no benefit to them now. The parties stipulated to the accuracy of the application form, and the form stated the price of the tickets.

■ We conclude that there was no prize involved in the ticket distribution plan. A prize is something of more value than the amount invested. *See State v. Turlington* (1918), 200 Mo.App. 192, 204 S.W. 821. Le-

sher and Dillon did not venture small sums for the chance of obtaining a larger value. *Hudelson v. State* (1883), 94 Ind. 426, 429. Rather, they invested the price of the tickets and received in exchange either the tickets or the entire amount invested. Therefore, since the price paid equals the market value, those receiving tickets got nothing of greater value than those who received refunds.

Even given the broader "effects" test as developed in *Nixon, supra,* the trial court was correct in determining, as a matter of law, that the ticket allocation plan did not constitute a lottery. There were no harmful effects from which Lesher and Dillon needed to be protected since they risked no loss and no "prize" was at stake.[1]

Lesher and Dillon also contend the trial court erred in determining, as a matter of law, that the Colts did not violate the deceptive practices act. According to IND. CODE 24–5–0.5–3:

> (Deceptive Act) (a) The following acts or representations as to the subject matter of a consumer transaction, made either orally or in writing by a supplier, are deceptive acts:
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> (4) that such subject of a consumer transaction will be supplied to the public in greater quantity than the supplier intends or reasonably expects;
>
> \* \* \* \* \* \*
>
> (10) that the supplier is able to deliver or complete the subject of the consumer transaction within a stated period of time, when the supplier knows or should reasonably know he could not. If no time period has been stated by the supplier, there is a presumption that the supplier has represented that he will deliver or complete the subject of the consumer transaction within a reasonable time, according to the course of dealing or the usage of the trade.

Lesher and Dillon claim that the Colts misstated the supply of tickets as well as the timing of distribution and that these acts constitute, "incurable deceptive acts." According to IND.CODE 24–5–0.5–2(7):

> (7) The term 'incurable deceptive act' means a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead.

■ The Colts argue that because the representations were forward-looking, they cannot be the basis of an action under the deceptive practices act. The act codifies the elements of common law fraud. *Schmidt Enterprises, Inc. v. State* (1976), 170 Ind.App. 628, 354 N.E.2d 247, 253. In an action for fraud, the misrepresentation must be as to existing facts; promises to do an act in the future are insufficient. *Rempa v. LaPorte Production Credit Association* (1983), Ind.App., 444 N.E.2d 308, 314.

Under the deceptive practices act, however, the focus is on the "intent to defraud *or* mislead." IC 24–5–0.5–2(7) (Emphasis added.) To mislead means to lead astray or into error or to guide wrongly. *McCormick Piano & Organ Co., Inc. v. Geiger* (1980), Ind.App., 412 N.E.2d 842, 849. Therefore, the deceptive practices act would seem to encompass forward-looking representations.

■ We conclude, however, that the trial court was correct in determining, as a matter of law, that the Colts did not commit an incurable deceptive act. The Colts did not intentionally defraud or mislead Lesher and

---

1. Lesher and Dillon claim the ticket allocation plan constituted a constitutionally proscribed lottery, yet they participated in the plan, knowing that a "blind lottery" was possible. Even if we were to conclude that the plan did constitute a constitutionally proscribed lottery, we would note the words of our supreme court in *Swain v. Bussell* (1858), 10 Ind. 438, 442:

 If the plaintiff, with the facts before him, saw proper to become a participant in such an illegal and prohibited transaction—a transaction not only in violation of the statute and the constitutional prohibition, but evidently, from the view taken of it by our law-makers, in contravention of public policy as understood by them, he is not in condition to ask, in this form, the aid of a Court of justice to relieve him from the superior skill of his associate.

Dillon regarding the number of tickets available. Authorized agents of the Colts announced that of the approximately 60,-500 tickets, 3,500 would be reserved for single-game sale prior to each game. The agents announced that approximately 57,-000 season tickets would be available. The Colts made no representation to the effect that all of the approximately 57,000 tickets would be distributed through the ticket allocation plan in question. Therefore, the fact that only 52,000 out of the 57,000 were distributed through the plan in question is insufficient to establish that the Colts committed an incurable deceptive act.

Further, the Colts did not defraud or mislead Lesher and Dillon regarding the timing involved in the ticket allocation plan. There is no need to look at what constitutes a "reasonable time, according to the course of dealing or the usage of trade," IC 24–5–0.5–3(a)(10), since the Colts made a statement regarding timing of the ticket distribution. The Colts, through both the application form and the newspaper article, stated that tickets would be distributed two weeks prior to the August 11 home exhibition game. The tickets and refunds were in fact distributed at that time.

■ Lesher and Dillon rely on a statement made by Colts owner Bob Irsay in the April 18 newspaper article as the basis for their claim regarding timing. When asked how soon the orders would be processed, Irsay responded, "Hopefully we'll have something within two or three weeks." (R. 255) We conclude that this statement did not constitute a representation of fact. It is vague and speculative and represents, at best, Irsay's opinion as to how the ticket process should be run. Such a speculative statement, especially when presented simultaneously with a clear statement, e.g., that tickets would be distributed two weeks

before the first home exhibition game, does not provide a sufficient basis for a claim under the deceptive practices act. Lesher and Dillon voluntarily entered into the ticket allocation process knowing they would not receive anything until the end of July. Because the Colts made no misrepresentation of fact which led Lesher and Dillon astray, the trial court was correct in determining, as a matter of law, that the Colts did not violate the deceptive practices act.[2]

Lesher and Dillon next contend the trial court erred in determining, as a matter of law, that the Colts did not commit civil theft. In order to collect treble damages under IC 34–4–30–1, the Colts must be found to have violated IND.CODE 35–43–4–3, which provides:

> A person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion, a Class A misdemeanor.

Lesher and Dillon voluntarily submitted applications and checks to the Colts with knowledge that the Colts would cash the checks. The application form clearly stated that an applicant's cancelled check would serve as his receipt. Lesher and Dillon never performed any affirmative act which would have put the Colts on notice that the Colts' control over their money was unauthorized.

■ Although demand is not an element of criminal conversion, it is evidence of intent. *Lambert Enterprises, Inc. v. Yellowbird, Inc.*, (1986), Ind.App., 496 N.E.2d 406, 409–410. Where the initial possession is lawful, conversion occurs after either an unqualified demand for return is made, *Coffel v. Perry* (1983), Ind.App., 452 N.E.2d 1066, 1069, or some other act is performed which puts the possessor, on notice that his control is no longer authorized. *See Lambert, supra.* Lesher and Dillon

2. Lesher and Dillon also contend the trial court erred in not specifically addressing Dillon's claim under the deceptive practices act. This contention is waived for failure to raise it in the motion to correct errors. Ind.Rules of Procedure, Trial Rule 59(D). Even absent waiver, the trial court is not obligated to make findings of fact and conclusions of law when it disposes of all issues and claims in a case by entering summary judgment in favor of one party. *Richardson v. Citizens Gas & Coke Utility* (1981), Ind. App., 422 N.E.2d 704. The trial court in this case did provide conclusions and was careful to point out that the term "Lesher" was being used to cover both Lesher and Dillon.

admit that they made no demand for the return of their money, but argue that any demand would have been futile. They cite as authority *Merchants National Bank and Trust Co. v. H.L.C. Enterprises* (1982), Ind.App., 441 N.E.2d 509, 514, wherein the court stated: "Equity should not and will not require the performance of a useless formality." They rely on the fact that Bruce Clark sent a letter to the Colts requesting a refund, and his letter was returned to him. The fact that Clark may have attempted to put the Colts on notice that their control of his money was no longer authorized does not inure to the benefit of Lesher and Dillon. Therefore, as far as the Colts knew, their use of Lesher's and Dillon's funds was authorized, and, as a matter of law, they are not liable for civil theft.

Lesher and Dillon next contend the trial court erred in failing to consider their claim for damages for unjust enrichment. Quite frankly, this court is having difficulty discerning the nature of Lesher and Dillon's equitable claim. Their memorandum in opposition to the Colts' T.R. 56 motion speaks in terms of a "constructive trust" and an "accounting." Their appellate brief speaks in terms of "quantum meruit" and "quasi contract."[3] As best we can discern, Lesher and Dillon want the interest earned on their ticket money.

We conclude the trial court did not err in failing to address the rather nebulous equitable claim. The language used in Lesher and Dillon's memorandum in opposition to the Colts' T.R. 56 motion indicates that the unjust enrichment claim was merely a vehicle to award damages based on the alleged illegal acts encompassed in the theories of lottery, deceptive practices act, and civil theft. In fact, when the trial judge, at oral argument, stated the issues in the case as lottery, deceptive practices act, and civil theft, counsel for Lesher and Dillon agreed and added that equitable relief would be proper if the ticket allocation plan were determined to be a lottery.

The trial court, viewing the equitable claim merely as an appendage to the other claims, granted summary judgment on all issues. It was therefore not obligated to make any findings or conclusions at all. *Richardson, supra.* Its conclusions as to the issues of lottery, deceptive practices act, and civil theft disposed of the unjust enrichment claim.

We would point out that a claim for interest on the ticket money under a theory of unjust enrichment is without merit. The application form made it clear that the checks would be cashed and that the tickets (or by implication refunds) would not be distributed until the end of July. The form made no statement to the effect that interest would be paid on the funds held. The mere fact that one party deposits funds with another party does not give rise to a trust relationship and thereby create an obligation to pay interest on the funds held. *Judd v. First Federal Savings & Loan Association* (1983), 7th Cir., 710 F.2d 1237. Therefore, Lesher and Dillon are not entitled to interest on the money held by the Colts.

The Colts contend that this appeal is frivolous and that they are entitled to appellate attorney's fees pursuant to A.R. 15(G). That rule provides:

> If the court on appeal affirms the judgment, damages may be assessed in favor of the appellee not exceeding ten per cent (10%) upon the judgment, in money judgments, and in other cases in the discretion of the court; and the court shall remand such cause for execution.

A discretionary award of damages is proper where an appeal is frivolous, or without substance or merit. *Matter of Watson* (1983), Ind.App., 449 N.E.2d 1156, 1160 (quoting *Marshall v. Reeves* (1974), 262 Ind. 403, 404, 316 N.E.2d 828, 830).

---

**3.** To the extent that Lesher and Dillon seem to vacillate regarding exactly what equitable theory to pursue, the theories are waived pursuant to T.R. 59(D) and Ind.Rules of Procedure, Appellate Rule 8.3(A)(7).

Appellate Rule 15(G) allows recovery of appellate attorney's fees where a party has acted in bad faith. *Briggs v. Clinton County Bank & Trust Co.* (1983), Ind.App., 452 N.E.2d 989, 1014. A strong showing is required to justify an award of attorney's fees under A.R. 15(G) since such damages are an extraordinary measure. *Matter of Watson, supra* at 1160. The fees will be sparingly awarded in order to avoid chilling the exercise of a party's right to review. *Briggs, supra* at 1015. *See* Ind. Const., art. 1, § 12.

We conclude that an award of appellate attorney's fees is appropriate in this case. Basically, what Lesher and Dillon seek is interest on their ticket money from April to July.

Lesher sought tickets and received them. The notion that he was deprived of the use of his funds and should receive interest on them is absolutely untenable. He voluntarily submitted an application form, which stated that his cancelled check would be his receipt and that he would receive the tickets two weeks before August 11. The Colts remained true to those representations. Even if the Colts had sent him his tickets sooner, he would not have been able to get any use out of them since the first game was not until August 11. Further, he would not have earned interest income on the tickets. He received the items for which he bargained, items which were not of themselves interest-bearing.

Dillon unfortunately did not receive any tickets, but he did receive a full refund. He not only received a refund of the ticket price, but also received a refund of the handling fee. Like Lesher, Dillon voluntarily submitted an application for tickets, and cannot now attempt to write new terms into the agreement. He agreed to the terms contained in the form and never informed the Colts otherwise. The terms did not provide for interest on funds held. Even if Dillon had held the funds himself, he would have had to actively pursue a method of having the funds held which would provide for interest.

The notion that the Colts were to act as a banking institution is ludicrous. To hold as such would produce grave results in areas such as catalog sales and advance-sale tickets for events. When one party is aware that the other will be holding his money and does nothing to negotiate an agreement regarding interest income, this court will not create, after the fact, a duty on the part of the holding party to pay interest.

It is evident that this case arose because demand for Colts season tickets exceeded supply. The Colts tried to deal with the situation in as equitable a manner as possible in order to insure that "the little guy" could get tickets too. They did not hide from the public their intent to use a "blind lottery" and they adequately disclosed the facts regarding the cashing of the checks and the timing of the distribution. Quite frankly, we are annoyed at having to devote our time and energy to an absolutely meritless claim for un-negotiated interest.[4]

The Colts are therefore entitled to appellate attorney's fees and expenses. They have submitted an affidavit regarding the attorney's fees charged and the hours spent in defending them on appeal. We conclude that this documentation is adequate to indicate that the charges were reasonable. *Briggs, supra* at 1015. Lesher and Dillon, in their reply brief, did not contest the reasonableness of the fees charged. Accordingly we affirm and order Lesher and Dillon to pay the Colts' appellate attorney's fees and expenses in the amount of $3,997.30.

MILLER, J., concurs.

CONOVER, P.J., concurs on the merits, but would award costs on appeal only, not attorney's fees.

4. We are unpersuaded by Lesher and Dillon's argument that the trial court's comment as to the tremendous lawyering by counsel for both sides somehow gives this appeal merit.