ATTORNEYS FOR APPELLANTS
William N. Riley
Joseph N. Williams
Brad A. Catlin
Indianapolis, Indiana

Leonard W. Aragon
Robert B. Carey
Phoenix, Arizona

ATTORNEYS FOR APPELLEE
George T. Patton, Jr.
Peyton L. Berg
Indianapolis, Indiana

Douglas N. Masters
Chicago, Illinois

Michael Mallow
Benjamin King
Los Angeles, California

_____

In the

## Indiana Supreme Court

FILED
Apr 21 2011, 9:37 am

CLERK
of the supreme court,
court of appeals and
tax court

_____

No. 94S00-1010-CQ-544

TOM GEORGE, CHRIS VITRON,
LORI CHAPKO, AND EDWARD SNEAD,
ON BEHALF OF THEMSELVES AND ALL
OTHERS SIMILARLY SITUATED,

*Appellants (Plaintiffs below)*,

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,

*Appellee (Defendant below)*.

_____

Certified Question from the United States Court of Appeals for the Seventh Circuit, No. 09-3667
The Honorable Richard D. Cudahy, Circuit Judge
The Honorable Michael S. Kanne, Circuit Judge
The Honorable John W. Darrah, District Judge[*]

_____

**April 21, 2011**

**Sullivan, Justice.**

_____

[*] Honorable John W. Darrah, District Judge for the Northern District of Illinois, sitting by designation.

The NCAA randomly allocated championship sporting event tickets to applicants who had offered to purchase tickets by submitting the face value of the tickets along with a nonrefundable handling fee. The face-value amount (but not the handling fee) was refunded to applicants whose offers were not accepted. The NCAA's ticket-allocation process was not an illegal lottery under Indiana law because no prize was awarded to those applicants who received the opportunity to purchase tickets.

## Background

The National Collegiate Athletic Association ("NCAA") is an organization through which the nation's colleges and universities govern their athletic programs. Many NCAA competitions have gained widespread popularity, particularly the women's and men's NCAA Division I basketball tournaments and the NCAA Division I men's ice-hockey championship tournament. Due to both the popularity of such events and the limited seating in sports venues, demand for tickets often exceeds supply.

To distribute tickets to these events, the NCAA developed the following ticket-distribution system. The NCAA sets the face value of the tickets to its events many months before the event. Would-be ticket purchasers submit to the NCAA an application offering to purchase tickets for a particular event. Each applicant may submit only one application, but, for at least some events, an applicant can submit multiple offers on a single application, though only one offer can be accepted. When submitting an application, the applicant must submit the face value of the tickets along with a nonrefundable handling or service fee[1] for each offer. When demand exceeds supply, the NCAA uses a random-selection program to accept offers from the pool of offers. Applicants whose offers are accepted receive event tickets via overnight delivery. Applicants whose offers are rejected receive refunds of the ticket price, though it may take several weeks or months. No applicant receives a refund of the handling fee.

---

[1] Counsel for the plaintiffs has attached several different labels to this fee, including "entry fee." We refer to it as a "handling fee" throughout this opinion.

This ticket-allocation plan was used for the 2009 NCAA Men's Final Four, the championship round of the men's basketball tournament. The NCAA set the face value of the tickets at $150 each, and tickets were sold in pairs. Fewer than 5,000 tickets were released for sale and several hundred thousand people submitted offers. Each applicant could submit up to 10 offers to purchase a pair of tickets, but if one offer was accepted, the remaining offers were rejected. A handling fee of $6 was charged for each offer.[2] If an applicant's offer was accepted, he or she would receive game tickets via overnight mail, and if that applicant had made more than one offer, he or she also received a refund of the total ticket price for the other (rejected) offers,[3] though it would arrive several months later. Applicants whom had all their offers rejected also received refunds of the total ticket price offered. No one received a refund of the handling fees.

The plaintiffs in this case submitted offers to the NCAA to purchase tickets for the NCAA Division I men's basketball tournament, but their offers were not accepted. They submitted their applications knowing both that the handling fee was nonrefundable and that there was a possibility demand would exceed supply and that the random-selection process would be utilized. Dissatisfied with not being able to purchase tickets, the plaintiffs filed suit against the NCAA and Ticketmaster in federal court for the Central District of California. Ticketmaster settled with the plaintiffs and venue was transferred to the Southern District of Indiana.

The plaintiffs alleged several claims, but the underlying basis for all of their claims is the allegation that the NCAA's ticket-distribution system constitutes an unlawful lottery under Indiana law. Judge Lawrence dismissed the complaint with prejudice for failure to state a claim, holding that even if the NCAA was operating an illegal lottery under Indiana law, the plaintiffs' claims were barred by the equitable doctrine of in pari delicto because the plaintiffs were aware of the essential features of the process when they applied for tickets. George v. Nat'l Collegiate Athletic Ass'n, No. 1:08-cv-1684-WTL-JMS, 2010 U.S. Dist. LEXIS 113997, 2009 WL

---

[2] An applicant submitting only one offer was required to submit with the application $306 ($150 x 2 + $6) whereas an applicant submitting 10 offers was required to submit with the application $3,060 (($150 x 2) x 10 + ($6 x 10)).

[3] An applicant who submitted 10 offers, one of which was accepted, would receive a $2,700 refund (9 pairs of tickets x $300 per pair).

6965794 (S.D. Ind. Sept. 25, 2009).[4]  In other words, assuming the ticket-distribution process was an unlawful lottery, the plaintiffs could not seek help from the court because they knowingly participated in it.

On appeal, a panel of the United States Court of Appeals for the Seventh Circuit, in a 2-1 decision, reversed.  George v. Nat'l Collegiate Athletic Ass'n (George I), 613 F.3d 658 (7th Cir. 2010).  Over the dissent of Judge Cudahy, the majority held that the ticket-distribution process was a lottery under Indiana law; that the process did not fall within the statutory exception for bona fide business transactions; and that the in pari delicto defense was not available because the NCAA had a greater degree of fault than the plaintiffs.  Id. at 661-64.

The same panel, however, granted the NCAA's petition for rehearing and vacated its prior decision.  George v. Nat'l Collegiate Athletic Ass'n (George II), 623 F.3d 1135 (7th Cir. 2010) (per curiam).  It noted both that the question whether this distribution process was a lottery under Indiana law "is a close one" and that its decision "could have far-reaching effects."  Id. at 1137.  Pursuant to Indiana Appellate Rule 64, it certified the following three questions for our consideration:

1. Do the plaintiffs' allegations about the NCAA's method for allocating scarce tickets to championship tournaments describe a lottery that would be unlawful under Indiana law?

2. If the plaintiffs' allegations describe an unlawful lottery, would the NCAA's method for allocating tickets fall within the Ind. Code § 35-45-5-1(d) exception for "bona fide business transactions that are valid under the law of contracts"?

3. If the plaintiffs' allegations describe an unlawful lottery, do plaintiffs' allegations show that their claims are subject to an *in pari delicto* defense as described in Lesher[ v. Baltimore Football Club], 496 N.E.2d [785,] 790 n.1 [(Ind. Ct. App. 1986)], and Swain v. Bussell, 10 Ind. 438, 442 (1858)?

Id. at 1137-38.

---

[4] Judge Lawrence also dismissed for failure to plead with particularity a claim of fraud, see Fed. R. Civ. P. 9(b), but this issue is not within the scope of the Certified Questions.

We agreed to consider the questions by order dated October 29, 2010, Ind. Appellate Rule 64(B), and following the completion of supplemental briefing, held oral argument on December 22, 2010.

## Discussion

The underlying basis of the plaintiffs' claims is the allegation that the NCAA ticket-distribution process constitutes an unlawful lottery under Indiana law. The first certified question asks whether the ticket-distribution process constitutes a lottery. If the first question is answered in the affirmative, we are asked to proceed to the second question and determine whether the NCAA's ticket process falls within the statutory exception for bona fide business transactions valid under the law of contracts. If it does not, we are asked to proceed to the third question and determine whether the plaintiffs' claims are barred by the equitable doctrine of <u>in</u> <u>pari</u> <u>delicto</u>, as set forth in <u>Swain v. Bussell</u>, 10 Ind. 438, 442 (1858), and subsequent cases.

## I

To answer the first certified question, we consider the meaning and scope of Indiana Code section 35-45-5-3, which makes it a felony to conduct lotteries in Indiana.[5] That statute provides, in relevant part, that "[a] person who knowingly or intentionally . . . conducts lotteries or policy or numbers games or sells chances therein . . . commits professional gambling, a Class D felony." Ind. Code § 35-45-5-3(a)(4) (2008). Subsection (b) extends this proscription to activities over the Internet when they occur in Indiana or when the transaction directly involves a person located in Indiana. I.C. § 35-45-5-3(b)(4).

Because this is a penal statute, it is to be construed strictly. <u>FCC v. Am. Broad. Co., Inc.</u>, 347 U.S. 284, 296 (1954); <u>Brown v. State</u>, 868 N.E.2d 464, 470 (Ind. 2007) (citation omitted). Due process requires that a penal statute clearly define the prohibited conduct so that it provides

---

[5] Although this is a civil case, Indiana Code section 35-45-5-3 is a penal statute. In other words, we are asked to determine whether the allegations of the plaintiffs' complaint establish that the NCAA committed a crime. We are mindful that our holding may be a relevant precedent when defendants are prosecuted under this statute.

adequate and fair notice as to what precisely is proscribed.  Id. at 467; see also Healthscript, Inc. v. State, 770 N.E.2d 810, 815-16 (Ind. 2002) (explaining the void-for-vagueness doctrine, the rule of lenity, and the fair-notice requirement).  On the other hand, penal statutes should not be read so narrowly as to exclude cases they fairly cover.  Sales v. State, 723 N.E.2d 416, 420 (Ind. 2000) (citation omitted); Short v. State, 234 Ind. 17, 122 N.E.2d 82, 85 (1954) (citation omitted).

Our primary goal in construing statutes is to determine and give effect to the Legislature's intent.  State v. Oddi-Smith, 878 N.E.2d 1245, 1248 (Ind. 2008) (citation omitted).  The intent of the Legislature is best gleaned from the statutory text itself.  Id. (citation omitted).  When interpreting a statutory provision, we examine the statute as a whole and avoid "excessive reliance upon a strict literal meaning or the selective reading of individual words."  Id. (citation omitted).  Undefined words are given their plain, ordinary, and usual meaning, unless it would be plainly repugnant to the Legislature's intent or the context of the statute.  Ind. Code § 1-1-4-1(1) (2005); Hinojosa v. State, 781 N.E.2d 677, 680 (Ind. 2003) (citation omitted).  Finally, we presume that the Legislature intended for the language to be applied logically and consistent with the underlying goals and policies of the statute.  Oddi-Smith, 878 N.E.2d at 1248 (citation omitted).

## A

The statute does not define "lotteries."  See I.C. § 35-45-5-1 (defining other terms).  Indiana courts, including this Court, have been called upon to interpret the meaning of the term "lottery" on many occasions since at least 1851, when the Indiana Constitution was ratified with a provision that prohibited the General Assembly from authorizing lotteries.[6]  See Caesars Riverboat Casino, LLC v. Kephart, 934 N.E.2d 1120, 1121-22 (Ind. 2010) (providing brief history of gambling law in Indiana).  Our interpretations of this term, however, have not been consistent.

---

[6] The Indiana Constitutional prohibition on lotteries was repealed by voter referendum in 1988.  Kephart, 934 N.E.2d at 1122.

In <u>Tinder v. Music Operating, Inc.</u>, 237 Ind. 33, 142 N.E.2d 610, 614 (1957), we defined a lottery as "'[a] scheme for the distribution of prizes by lot or chance,'" especially "'a scheme by which one or more prizes are distributed by chance among persons who have paid or promised a consideration for a chance to win them.'" <u>Id.</u> at 614 (quoting <u>Webster's New International Dictionary</u>). This was the common and plain definition of "lottery" and the one historically applied by Indiana courts. <u>Id.</u>; <u>see</u> <u>also</u> <u>Hudelson v. State</u>, 94 Ind. 426, 429 (1884) ("'A lottery is a scheme for the distribution of prizes by chance – a game of hazard, in which small sums are ventured for the chance of obtaining a larger value, either in money or other valuables.'" (citation omitted)).

In <u>State v. Nixon</u>, 270 Ind. 192, 384 N.E.2d 152 (1979), however, we departed from the definition articulated in <u>Tinder</u>. In <u>Nixon</u>, we held that the constitutional prohibition on lotteries prevented the General Assembly from authorizing pari-mutuel wagering on horse races. <u>Id.</u> at 162. We interpreted the term "lottery" broadly, holding that the constitutional prohibition on lotteries "embrace[d] all forms of gaming which, by reason of retainage, service charge, or odds, preclude the participants, in sustained play, from winning while providing a reasonable expectancy of profit for the sponsors." <u>Id.</u> at 161. In other words, the constitutional prohibition on lotteries was interpreted to prohibit all forms of commercialized gambling.

Because the term is undefined in the statute, we must also consider its plain and ordinary meaning. In common parlance, the term "lottery" has come to represent any matter left to chance. Many standard dictionaries include this meaning as a secondary or tertiary definition of the term. <u>See</u> <u>Merriam-Webster's Collegiate Dictionary</u> 736 (11th ed. 2004) ("an event or affair whose outcome is or seems to be determined by chance") [hereinafter <u>Merriam-Webster's Collegiate</u>]; <u>Webster's Third New International Dictionary</u> 1338 (unabridged ed. 1976) (same) [hereinafter <u>Webster's Third</u>]. Indeed, the General Assembly has used the term "lottery" consonant with this more general definition in other sections of the Indiana Code. <u>See, e.g.</u>, Ind. Code § 3-10-1-18(b) (2005) (providing that, for certain elections, candidates' names appear on ballots in a randomized order determined by a "lottery"). This common understanding of "lottery" has also

been used in judicial opinions.  See, e.g., Hudson v. Michigan, 547 U.S. 586, 595 (2006) (describing a criminal defendant's invocation of the Fourth Amendment exclusionary rule for a knock-and-announce violation as a lottery with minimal cost and an enormous jackpot); Risk v. Schilling, 569 N.E.2d 646, 648 (Ind. 1991) (Givan, J., dissenting) (lamenting that too many citizens use the judicial system as though it were a lottery).

**A-2**

For purposes of Indiana Code section 35-45-5-3, we do not think the General Assembly intended the term "lottery" to embrace all forms of commercialized gambling, as was held in Nixon, or to include all matters of chance, as has become the common definition of the term. Rather, we think it intended "lottery" to have the definition adopted in Tinder and prior cases.

First, the definition articulated in Nixon would render most of the remainder of Indiana Code section 35-45-5-3 superfluous and unnecessary.  If the General Assembly had intended "lottery" to have the definition articulated in Nixon, it would not have listed the varying forms of conduct as it did.  It also would not have included "lotteries" with "policy" or "numbers games," both of which are specialized forms of gambling similar to traditional lotteries.[7]

Second, the modern common definition of lottery as "any matter determined by chance" is too broad.  To hold that the General Assembly intended this broad definition would lead to absurd results because the statute would proscribe all things in this State that are left to chance but not specifically exempt.  Moreover, although this broader definition is a common alternative definition in modern English dictionaries, the primary definition of "lottery" is similar to that quoted in Tinder.  See, e.g., Merriam-Webster's Collegiate, supra, at 736; Webster's Third, supra, at 1338.  Additionally, the leading legal dictionary[8] defines "lottery" as "[a] method of rais-

---

[7] "Policy" is "[a] type of lottery in which bettors select numbers to bet on and place the bet with a []policy writer."  Black's Law Dictionary 1276 (9th ed. 2009).  And a "numbers game" is "[a] type of lottery in which a person bets that on a given day a certain series of numbers will appear from some arbitrarily chosen source, such as stock-market indexes or the U.S. Treasury balance."  Id. at 1174.

[8] We generally prefer to consult standard dictionaries when interpreting the undefined terms of a statute.  Brown, 868 N.E.2d at 467.  But the term "lottery" has become a legal term of art, at least with respect to laws prohibiting or authorizing lotteries, given that the term has been the subject of many constitutions,

ing revenues . . . by selling tickets and giving prizes . . . to those who hold tickets with winning numbers that are drawn at random." Black's Law Dictionary 1032 (9th ed. 2009).

Finally, the definition articulated in Tinder has been consistently used by the Indiana Court of Appeals, notwithstanding Nixon. See, e.g., Pruitt v. State, 557 N.E.2d 684, 690-91 (Ind. Ct. App. 1990) (holding that a bingo game that awarded prizes and for which consideration was paid was an unlawful lottery), trans. denied; Lashbrook v. State, 550 N.E.2d 772, 775-76 (Ind. Ct. App. 1990) (holding that a pyramid scheme constituted a "lottery" under a similar definition). And this definition represents the definition accepted by an "overwhelming majority" of American jurisdictions, Opinion of the Justices No. 373, 795 So. 2d 630, 634-35 (Ala. 2001), including the United States Supreme Court, FCC v. Am. Broad. Co., Inc., 347 U.S. at 290. We also note that the parties in this case and the Seventh Circuit panel relied upon this definition, seemingly without question.

**B**

Thus, as used in Indiana Code section 35-45-5-3, the term "lottery" means a scheme for the distribution of prizes by lot or chance among those who provided or promised to provide consideration. Tinder, 142 N.E.2d at 614. Under this definition, there are three essential elements to a lottery: (1) a prize; (2) chance; and (3) consideration. Id.

The NCAA argued in its briefs to the Seventh Circuit that none of the three elements were present in the ticket-distribution process. The majority of the panel concluded that all three elements were present. See George I, 613 F.3d at 661-62. In this Court, the NCAA focuses only on the "prize" element.

---

statutes, and judicial opinions. Cf. Ind. Dep't of State Revenue v. Colpaert Realty Corp., 231 Ind. 463, 109 N.E.2d 415, 418-19 (1952) ("In construing statutes, words and phrases will be taken in their plain or ordinary and usual sense unless a different purpose is clearly manifest by the statute itself, but technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import." (citations omitted)).

9

The Indiana Court of Appeals considered a similar challenge in <u>Lesher v. Baltimore Football Club</u>, 496 N.E.2d 785 (Ind. Ct. App. 1986), <u>summarily aff'd in relevant part by</u> 512 N.E.2d 156, 157 (Ind. 1987).  In <u>Lesher</u>, the Indianapolis Colts, who had recently relocated to Indianapolis from Baltimore, used a randomized ticket-allocation process similar to that used by the NCAA in this case.  <u>See id.</u> at 787-88.  The plaintiffs submitted an application containing an offer to purchase Colts season tickets, along with a check for the face value of the tickets and a small handling fee.  <u>Id.</u> at 787.  The checks were negotiated and held in the Colts' account, and the Colts gained investment income on the deposited funds.  <u>Id.</u>  Approximately 52,000 seats were made available, but at the end of the application period, ticket demand was three times the supply.  <u>Id.</u> at 788.  Applicants were made aware that a "blind lottery" would be possible.  <u>Id.</u> The applicants selected in the blind draw received tickets, and applicants who did not receive tickets received a refund of both the face value of the tickets and the handling fee.  <u>Id.</u>

We summarily affirmed the holding of the Court of Appeals that the ticket-distribution process was not a lottery.  <u>Lesher</u>, 512 N.E.2d at 157, <u>aff'g</u> 496 N.E.2d at 789-90.  The Court of Appeals rejected the plaintiffs' contention that the tickets' value had not been established because "the court had before it evidence as to the price voluntarily paid by the purchasers, e.g., the market price."  <u>Lesher</u>, 496 N.E.2d at 789 (citation omitted).  The plaintiffs had failed to bring forward evidence that disputed the fact of value.  <u>Id.</u>  The court concluded that there was no prize:

> A prize is something of more value than the amount invested.  <u>See</u> <u>State v. Turlington</u>, 204 S.W. 821 (Mo. Ct. App. 1918).  Lesher and Dillon did not venture small sums for the chance of obtaining a larger value.  <u>Hudelson v. State</u>, 94 Ind. 426, 429 (1884).  Rather, they invested the price of the tickets and received in exchange either the tickets or the entire amount invested.  Therefore, since the price paid equals the market value, those receiving tickets got nothing of greater value than those who received refunds.

<u>Id.</u> at 789-90.

10

The plaintiffs make two primary arguments in an attempt to distinguish the NCAA's ticket-allocation process from the Colts' ticket-allocation process in <u>Lesher</u>.[9] First, they argue that because the handling fee is forfeited regardless of the outcome, those receiving tickets receive something of greater value than those who lost the handling fee and were not permitted to purchase tickets. We disagree.

Contrary to the plaintiffs' argument, the fact that the fee is nonrefundable means that both groups receive the same amount after the blind draw. Those applicants whose offers to purchase tickets are accepted receive tickets for $150 per ticket, whereas those applicants whose offers are rejected receive $150 in cash per ticket. Thus, like in <u>Lesher</u>, "those receiving tickets got nothing of greater value than those who received refunds." 496 N.E.2d at 790. Additionally, the plaintiffs have not alleged that their nonrefundable handling fees go toward providing extra benefits to successful applicants. Rather, they pled that the handling fees grossly exceed the amount needed for shipping and handling and that the handling fees grossly profit the NCAA. Thus, under the plaintiffs' theory, the majority of the handling fees, even for successful applicants, are profits distributed to the NCAA's general fund. The fact that the handling fees are usually refundable under other randomized ticket-distribution plans, including <u>Lesher</u>, does not alter the prize analysis. In fact, in those cases, unsuccessful applicants receive more than successful applicants because they receive the face value of the tickets plus the handling fee, whereas successful applicants receive only the tickets, which are worth the face value. Although the nonrefundable nature of the handling fee may alter the consideration analysis, it does not alter the prize analysis.

The plaintiffs' second argument distinguishing <u>Lesher</u> is based on the differing procedural posture of this case. In <u>Lesher</u>, the Indiana Court of Appeals was reviewing the trial court's grant of summary judgment for the Colts. The plaintiffs in this case argue that the face value of the Colts tickets was held to be market value only "[b]ecause [the plaintiffs] did not come for-

---

[9] The plaintiffs also argue that the overnight delivery of tickets and the premium seating are "prizes." Under the analysis used in <u>Lesher</u>, these clearly are not prizes because successful applicants pay for these benefits through either the handling fee or increased ticket pricing.

ward with evidence disputing the fact of value." Lesher, 496 N.E.2d at 789. The procedural posture of this case, on the other hand, is the motion-to-dismiss stage, wherein the plaintiffs' allegations are accepted as true and the defendant prevails only if those allegations fail to state a cognizable claim. See Fed. R. Civ. P. 12(b)(6); Tamayo v. Blagojevich, 526 F.3d 1074, 1081 (7th Cir. 2008) (citations omitted). They argue that they have alleged that the market value of the tickets was far greater than the face value and thus the tickets constitute a prize, even though the tickets in Lesher did not. The majority of the Seventh Circuit panel agreed with the plaintiffs' procedural argument, holding that "Plaintiffs need only have alleged that the fair-market value of the tickets exceeded their face value such that those tickets constitute something of more value than the amount invested." George I, 613 F.3d at 662. We respectfully disagree.

We note, as a preliminary matter, that although the plaintiffs in Lesher did not present evidence that market value exceeded face value, basic economics suggests that the tickets in Lesher were worth more on the secondary market because demand exceeded supply three-fold. 496 N.E.2d at 788. And, in any event, we agree with Judge Cudahy's dissent that this argument concerning the presence of a secondary market is misleading. See George I, 613 F.3d at 665 (Cudahy, J., dissenting).

In cases like this and Lesher, the critical fact is that no market for tickets exists until the event coordinator issues the tickets in the first place, so, as a matter of law, the face value of the tickets equals the fair-market value of the tickets on the primary market. Here, the NCAA created the primary market for the tickets, and the value realized by the NCAA is in fact the face value of the tickets. But for the NCAA issuing tickets to one of its events, there could never be a secondary market. Once the NCAA sells tickets, the tickets will have a resale value in a secondary market, but, for a plethora of reasons, that resale value may be above or below the face value. For example, the event may be undersold. Even if the event is oversold, there may be no excess demand once the competitors are determined. Other factors may affect the secondary market for tickets, such as the general state of the economy, weather predictions, or an injury to a star competitor. The speculative nature of the secondary market makes it an inappropriate consideration in determining the presence of a prize in this case.

The plaintiffs argue that this approach will enable scam artists to evade criminal prosecution, for example, by charging a $10 entry fee for a chance to win the right to purchase a $100,000 gold coin for $20.  If enough people participated, the scam artist could make millions in the entry fees and give up a coin worth only $100,000.  And the winner of the drawing would merely be obtaining the right to purchase something.  But we think schemes like those suggested by the plaintiffs are readily distinguishable from ticket-distribution plans like the NCAA's.  In the gold-coin scheme, the scam artist is not setting the primary market.  There is already a verifiable market against which the value of the coin may be measured, and there is little speculation as to what the coin will be worth on the secondary market, except for routine market fluctuation.

We also conclude that the historical policies underlying the general prohibitions on lotteries are not implicated by the NCAA's ticket-allocation plan.  Historically, lotteries were viewed as the lowest and most pernicious form of gambling and were thus treated most harshly under the law.  Nixon, 384 N.E.2d at 160.

> Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the wide-spread pestilence of lotteries.  The former are confined to a few persons and places, but the latter infests the whole community:  it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple.

Phalen v. Virginia, 49 U.S. (8 How.) 163, 168 (1850).  In Nixon, we also noted,

> To dream of riches unearned and the willingness to gamble to achieve them appear to be inherent in the nature of man. . . .  [This] becomes an injurious nuisance, a "pestilence," when capitalized upon by those who do not gamble or play the game at all but make an unconscionably profitable business of providing the temptation, lure of profits that are out of all proportion to investment, labor and skill involved, to the weak and unwary.

384 N.E.2d at 160-61.

13

The NCAA's process for allocating scarce tickets does not implicate any of these policies.[10] When submitting offers to purchase tickets, applicants must submit the face value of the tickets along with the handling fee. Thus, to submit one offer to purchase a pair of tickets to the 2009 Men's Final Four, an applicant was required to submit $306 ($300 for two tickets and a $6 handling fee). This is significantly different from submitting a $1 or even a $10 fee for a chance at winning a much larger sum of money. In order to apply for tickets, the applicant must have an appreciable disposable income or other substantial means. The NCAA's ticket process therefore does not "reach[] every class" or "prey[] upon the hard earnings of the poor." Moreover, the applicants who are successful do not necessarily increase their fortunes; they merely receive a license to attend a collegiate sporting event. The prospect of bettering one's fortunes is entirely speculative at the time applications are submitted, and, to make a profit on the putative secondary market, the successful ticket purchaser must forego the very benefit acquired through the ticket-allocation process – the license to attend the event.

In sum, it would stretch the definition of "lottery" beyond what the General Assembly intended to hold that the NCAA's ticket-distribution plan is a proscribed lottery under Indiana Code section 35-45-5-3. The NCAA creates the primary market by issuing tickets in the first place, and it sets the price for these events many months in advance. In setting the price, the NCAA reasonably calculates what the fair-market value at the time of the event will be. Moreover, the NCAA's ticket process is not materially different from the process utilized by the Indianapolis Colts in Lesher. We note, however, that our holding would not prevent a prosecutor or plaintiff from attacking a similarly structured scheme that is merely a ruse for a traditional lottery. Barring such a ruse, we conclude that where an event coordinator creates the primary market for event tickets, the fair-market value of the tickets is equal to their face value. In this case, there was no "prize" and hence no "lottery" because at the time applicants submitted to the NCAA their offers to purchase tickets, the market value equaled the face value of the tickets. Thus, as a matter of law, the NCAA's ticket-distribution plan is not a lottery.

---

[10] In fact, the NCAA's plan appears to be a reasonable method of addressing a difficult problem, and it seems to distribute tickets in a more fair and civilized manner than a first-come-first-served process.

## II

Both the second and the third certified questions are conditioned on a finding that the NCAA's ticket-distribution plan constitutes a "lottery" under Indiana law. Because we hold that the plaintiffs have <u>not</u> alleged such a lottery, we have no occasion to consider these last two questions.

## Conclusion

We hold that the NCAA's ticket-distribution plan does not constitute a lottery under Indiana Code section 35-45-5-3 because there was no "prize" awarded to those whose offers to purchase tickets were randomly accepted by the NCAA.

Shepard, C.J., and Dickson, Rucker, and David, JJ., concur.